CASE NO.: 24-11398-F
_____

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**
_____

ALLIED PROPERTY AND CASUALTY INSURANCE COMPANY and AMCO
INSURANCE COMPANY,
PLAINTIFFS-APPELLEES

v.

BLOODWORTH WHOLESALE DRUGS, INC.,
DEFENDANT-APPELLANT

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION
CASE NO.: 7:22-cv-00113-WLS

# APPELLANT BLOODWORTH WHOLESALE DRUGS, INC.'S, OPENING BRIEF

CHRISTOPHER L. FOREMAN
Georgia State Bar Number: 507739
TYERUS R. SKALA
Georgia State Bar Number: 764980
F. FAISON MIDDLETON, IV
Georgia State Bar Number: 504745
Attorneys for Defendant-Appellant
WATSON SPENCE LLP
320 W. Residence Ave
Albany, Georgia 31701-2008
(229) 436-1545 Telephone
cforeman@watsonspence.com
tskala@watsonspence.com
fmiddleton@watsonspence.com

<u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE</u>
<u>DISCLOSURE STATEMENT</u>

The undersigned Insurers' counsel of record for Defendants-Appellant, F. Faison Middleton, IV in compliance with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, certifies that the following listed persons and parties have, or may have had, an interest in the outcome of this appeal:

Allied Group, Inc., Plaintiff-Appellee;

Allied Property and Casualty Insurance Company, Plaintiff-Appellee;

AMCO Insurance Company, Plaintiff-Appellee;

Bloodworth Wholesale Drugs, Inc., Defendant-Appellant;

Lee Clayton, Attorney for Plaintiff-Appellee;

Christopher L. Foreman, Attorney for Defendant-Appellant;

Thomas Q. Langstaff, United States Magistrate Judge, Middle District of Georgia;

F. Faison Middleton, IV, Attorney for Defendant-Appellant;

Nationwide Mutual Insurance Company, Plaintiff-Appellee;

W. Louis Sands, United States District Judge, Middle District of Georgia;

Tyerus R. Skala, Attorney for Defendant-Appellant; and

Lauren D. Woodrick, Attorney for Plaintiff-Appellee.

No publicly traded company or corporation has an interest in the outcome of this appeal.

ii

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Bloodworth Wholesale Drugs, Inc. believes oral argument is necessary, as there are novel or complicated issues of law that are being inconsistently decided across the United States and which have not yet been addressed by the Eleventh Circuit.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS ........................................................................ iv

TABLE OF CITATIONS ........................................................................ vi

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.....1

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE................................................................3

   I.   Course of Proceedings and Disposition in the Court Below ..........................3

   II.  Statement of Facts................................................................5

      A.  Bloodworth And The CGL Policies................................................5

      B.  Contents Of Insurance Agreements ...............................................6

      C.  Bloodworth's Inclusion in the Opioid Litigation.................................8

      D.  Insurers' Reservation of Rights...................................................10

      E.  Settlement of Claims Connected to the Underlying Litigation.................11

   III.  Standard of Review .................................................................12

SUMMARY OF ARGUMENT .................................................................13

ARGUMENT AND CITATIONS OF AUTHORITY ...........................................15

   I.   The District Court Incorrectly Found the Underlying Litigation Did Not Allege Harm "Because of 'Bodily Injury.'"......................................................15

      A.   The District Court ignored Georgia law in determining "because of 'bodily injury'" is not ambiguous. ................................................................16

      B.   The District Court erroneously determined the Underlying Lawsuits did not constitute harm "because of 'bodily injury'" in accordance with Georgia law. ..................................................................................23

      C.   Decisions from across the Country in jurisdictions with laws similar to Georgia have found allegations similar to the Underlying Litigation to allege "because of 'bodily injury.'" ..........................................................31

iv

II. The District Court erred in finding the Underlying Litigation did not allege an "Occurrence." ................................................................................................36

   A.   The District Court's premature finding that there was not an "occurrence," as defined by the Bloodworth Policies constitutes a Due Process violation. .....36

   B.   The Underlying Litigation satisfies the definition of "Occurrence" ..........40

CONCLUSION ................................................................................................47

CERTIFICATE OF COMPLIANCE ...................................................................49

CERTIFICATE OF SERVICE ...........................................................................50

<u>TABLE OF CITATIONS</u>

**Cases**

*ACE Am. Ins. Co. v. Rite Aid Corp.*, 270 A.3d 239 (Del. 2022) ..................... 19, 29

*Ace Am. Ins. Co. v. Wattles Co.*, 930 F.3d 1240 (11th Cir. 2019)................... 19, 27

*Acuity v. Masters Pharm., Inc.*, 2022-Ohio-3092, 205 N.E.3d 460 .......................19

*\*AIU Ins. Co. v. McKesson Corp.*, 598 F. Supp. 3d 774 (N.D. Cal. 2022)...... 32, 33

*Allstate Ins. Co. v. Justice*, 493 S.E.2d 532 (Ga. Ct. App. 1997)...........................43

*Allstate Ins. Co. v. Neal*, 696 S.E.2d 103 (Ga. Ct. App. 2010) ..............................44

*Allstate Prop. & Cas. Ins. Co. v. Roberts*, 696 F. App'x 453 (11th Cir. 2017) .......42

*AmerisourceBergen Drug Corp. v. ACE American Insurance Co.*, 2020 W. Va.

    Cir. LEXIS 3 (Jan. 7, 2021) ...................................................................33

*Auto-Owners Ins. Co. v. Ralph Gage Contracting, Inc.*, 748 Fed. Appx. 967 (11th

    Cir. 2018) ..............................................................................................21

*Brown v. Georgia Power Co.*, 134 Ga. App. 784 (1975) ........................................38

*Brown v. Shalala*, 44 F.3d 931 (11th Cir.1995)......................................................39

*Cafeteria Workers v. McElroy*, 367 U.S. 886 (1961) .............................................39

*Certain Underwriters at Lloyd's of London v. Rucker Const., Inc.*, 285 Ga. App.

    844 (2007) ............................................................................... 19-20, 32

*Christopher v. Harbury*, 536 U.S. 403 (2002).......................................................38

*Cincinnati Ins. Co. v. H.D. Smith*, L.L.C., 829 F.3d 771 (7th Cir. 2016) ..............32

*Colonial Oil Indust., Inc. v. Underwriters Subscribing to Policy Nos.*

    *T031504670, T031504671*, 1995 WL 495991 (S.D. Ga. 1995)............. 43, 44, 45

*Dep't of Cmty. Health v. Pruitt Corp.*, 295 Ga. App. 629 (2009)...........................24

*Envision Printing, LLC v. Evans*, 336 Ga.App. 635 (2016) ...................................16

*Evanston Ins. Co. v. Mellors*, 141 F. Supp. 3d 1367 (S.D. Ga. 2015)....................18

*Georgia State Fin. & Inv. Comm'n v. XL Specialty Ins. Co.*, 303 Ga. App. 540

    (2010) ................................................................................................................24

*Giant Eagle, Inc. v. Am. Guar. & Liab. Ins. Co.*, 499 F. Supp. 3d 147 (W.D. Pa.

    2020) ........................................................................................... 34, 48

*Giles v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 578 F. Supp. 376 (M.D. Ga.

    1984) ................................................................................................24

*Great Lakes Ins. SE v. Wave Cruiser LLC*, 36 F.4th 1346 (11th Cir. 2022)...........12

*Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710 (11th Cir. 2019) ................... 38, 41

*In re Fisher Island Invs., Inc.*, 778 F.3d 1172 (11th Cir. 2015) .............................41

*Johnson v. Niehus*, No. CV 105-125, 2008 WL 11417673, at *6 (S.D. Ga. Sept. 30,

    2008) ................................................................................................31

*Lunceford v. Peachtree Cas. Ins. Co.*, 230 Ga. App. 4 (1997)................. 17, 19, 23

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ................................................ 38, 39, 41

*McDonald Const. Co. v. Bituminous Cas. Corp.*, 279 Ga. App. 757 (2006) ..........35

*Mesa Valderrama v. United States*, 417 F.3d 1189 (11th Cir. 2005).....................38

*Morrissey v. Brewer*, 408 U.S. 471 (1972)..............................................39

*Nationwide Mut. Fire Ins. Co. v. Dillard House, Inc.*, 651 F. Supp. 2d 1367 (N.D.

   Ga. 2009).......................................................................46

*Nationwide Mut. Fire Ins. Co. v. Kim*, 294 Ga. App. 548 (2008) ..........................28

*Owners Ins. Co. v. James*, 295 F. Supp. 2d 1354 (N.D. Ga. 2003)........................43

*Pac. Emp'rs Ins. Co. v. Cesnik*, 219 F.3d 1328 (11th Cir. 2000)......... 18, 21, 24, 35

*Parham v. Peterson, Goldman & Villani*, 296 Ga. App. 527 (2009) .....................24

*Provau v. State Farm Mut. Auto. Ins. Co.*, 772 F.2d 817 (11th Cir.1985)..............16

*Resurgens, LLC v. Ervin*, 369 Ga. App. 675 (2023).................................30

*SCI Liquidating Corp. v. Hartford Fire Ins. Co.*, 181 F.3d 1210 (11th Cir. 1999).24

*Shelley v. Kraemer*, 334 U.S. 1 (1948) ...................................................38

*Se. Color Lithographers, Inc. v. Graphic Arts Mut. Ins. Co.*, 164 Ga. App. 70

   (1982)............................................................................22

*Southern Guaranty Ins. Co. v. Saxon*, 190 Ga.App. 652 (1989) ............................43

*Stein v. Mass. Bay Ins. Co.*, 324 S.E.2d 510 (Ga. Ct. App. 1984)..........................43

*Turnes v. AmSouth Bank, NA*, 36 F.3d 1057 (11th Cir. 1994) ...............................12

*Unigard Sec. Ins. Co. v. Murphy Oil USA, Inc.*, 331 Ark. 211 (1998)............. 35, 36

*\*Walmart, Inc. v. ACE American Ins. Co., et al.*, Case No: 04CV22-2835-4 (Ark.

   Cir. Ct. December 29, 2023)......................................................... 34, 47

*Welch v. Celotex Corp.*, 951 F.2d 1235 (11th Cir. 1992) .........................................13

**Statutes**

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1332 ..................................................................................1

28 U.S.C. § 2201 ..................................................................................1

O.C.G.A. § 10-1-370 ..........................................................................46

O.C.G.A. § 10-13B-1 ............................................................... 11, 30, 31

O.C.G.A. § 10-13B-3 .................................................................... 11, 30

O.C.G.A. § 13-2-2(5) .........................................................................24

**Rules**

Fed. R. Civ. P. 56(a) ..........................................................................12

Fed. R. Civ. P. 56(f) ..........................................................................41

Fed. R. Civ. P. 57 ..............................................................................41

**Other Authorities**

U.S. CONST. AMEND. 14 .......................................................................38

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The District Court had subject matter jurisdiction over this case brought pursuant to 28 U.S.C. §§ 1332, Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291, as this case involves the appeal of a final decision of the district court.

## STATEMENT OF THE ISSUES

Allied Property and Casualty Insurance Company ("Allied") and AMCO Insurance Company ("AMCO") (Allied and AMCO are hereinafter collectively referred to as "Insurers") issued numerous insurance policies for consecutive one-year periods from May 31, 2006 to May 31, 2018 (the "Bloodworth Policies") to Bloodworth Wholesale Drugs, Inc. (hereinafter referred to as "Bloodworth"). Bloodworth is, and at all times relevant has been an independent wholesale distributor of generic pharmaceuticals, including generic opioids. Beginning in 2017, Bloodworth was named in twenty-six lawsuits alleging its role in the national opioid crisis (hereinafter referred to as the "Underlying Litigation"). Bloodworth has sought a defense against the allegations asserted against it as well as sought indemnification under the policies should a judgment be entered against it.

1

After each party filed their respective briefs as to whether the complaints in the Underlying Litigation alleged damages "because of 'bodily injury,'" the Court issued its Order denying Bloodworth's Motion for Summary Judgment and granting Insurers' Motion for Summary Judgment, while also addressing whether there was an "occurrence," as defined by the Bloodworth Policies.  The issues before this Honorable Court are:

1.    Whether the District Court erred in determining that the damages asserted in twenty-six lawsuits within the Underlying Litigation do not constitute damages, "because of 'bodily injury,'" under the pertinent insurance contracts and in accordance with Georgia law?

2.    Whether the District Court erred in entering an order on the issue of whether the claims constituted an "occurrence" where the Court in two previous orders stated it was not yet making a determination as to "occurrence"?

3.    Whether the District Court erred in determining that Bloodworth's acts which are the basis for the allegations contained within the Underlying Litigation do not constitute an "occurrence," as defined in the Bloodworth Policies and in accordance with Georgia law.

<u>STATEMENT OF THE CASE</u>

**I.    Course of Proceedings and Disposition in the Court Below**

This appeal follows the District Court's grant of summary judgment to Insurers in the declaratory judgment action filed below.

Insurers filed their initial complaint on October 20, 2022. (Doc. 1) Bloodworth filed its answer on November 22, 2022. (Doc. 11) Insurers subsequently filed their amended complaint on November 23, 2022 (Doc. 14), to which Bloodworth answered on December 8, 2022. (Doc. 17) The Insurers contend in the declaratory judgment that they do not owe indemnification or a defense to Bloodworth in the Underlying Litigation under the Bloodworth Policies. (Doc. 1)

Importantly, in the course of the declaratory judgment action, the parties entered into the Amended Discovery and Scheduling Order (Doc. 23), whereby the parties and Court agreed to bifurcate the insurance coverage issues into two distinct phases of summary judgment briefing. Pursuant to the Order, the initial and sole issue to be resolved by the District Court during the first phase of briefing was whether "Plaintiffs in the underlying litigation seek "damages because of 'bodily injury' or 'property damage,'" as those terms are used in the [Bloodworth Policies].. . ." (*Id.*) Only if Bloodworth was successful during the first phase of summary judgment briefing would the District Court thereafter reopen discovery for sixty days for the purpose of investigating and resolving remaining coverage issues including, but not limited to, whether the complaints in the Underlying Litigation alleged an

3

"occurrence" as that term is used in the Bloodworth Policies or whether the Insurers could rely on exclusions within the policy to disclaim coverage. (*Id.*)

Both parties filed their respective Motions for Summary Judgment on August 28, 2023, and as mandated by the Amended Discovery and Scheduling Order, Bloodworth and Insurers solely focused their argument on whether "Plaintiffs in the underlying litigation seek "damages because of 'bodily injury' or 'property damage,' as those terms are used in the [Bloodworth Policies] . . . ." (Docs. 29, 31) After the parties filed their briefs, responses, and replies thereto (Docs. 35, 36, 39, 40), the Court asked for supplemental briefing as to whether the term "occurrence" modifies the term "because of 'bodily injury'". (Doc. 41) Notably, the Court was "not seeking to discuss the discrete matters as to 'occurrence' as to any particular claims at this stage of summary judgment briefing . . . ." (*Id.*)

The Court issued its Order denying Bloodworth's Motion for Summary Judgment and granting Insurers' Motion for Summary Judgment. *See generally* (Doc. 45) In its Order, the District Court ruled that the language within the Bloodworth Policies was not ambiguous, and the complaints in the Underlying Litigation did not seek damages "because of 'bodily injury'." (*Id.*) Astonishingly, and in direct contradiction to two prior Orders stating to the contrary, without permitting briefing as to the substantive and "discrete matter [of] 'occurrence'" the Court additionally held that the complaints in the Underlying Litigation did not

allege an "occurrence," as that term is used and defined within the Bloodworth Policies. Bloodworth filed its Notice of Appeal on April 25, 2024. (Doc. 46)

## II.    Statement of Facts

### A. Bloodworth And The CGL Policies

Bloodworth is an independent wholesale distributor of generic pharmaceuticals. Bloodworth receives and fills orders for generic pharmaceuticals, including orders for generic opioids, and fills those orders from said pharmacies. In its capacity as a drug wholesaler, Bloodworth sought insurance through Insurers. *See* (Doc. 31-2) Allied issued to Bloodworth Policy Numbers ACP GLPO 7102204036, ACP GLPO 7112204036, ACP GLPO 7122204036, ACP GLPO 7132204036, ACP GLPO 7142204036, ACP GLPO 7152204036, ACP GLPO 7162204036, ACP GLPO 7172204036, ACP GLPO 7182204036, and ACP GLPO 7192204036 for consecutive one-year periods from May 31, 2006 to May 31, 2018 (the "CGL Policies"). *See Facts Stipulated By The Parties* (Doc. 28, p. 1) The CGL Policies provide limits of liability of $1,000,000.00 for each occurrence, subject to a general aggregate limit per policy period of $2,000,000.00. (Doc. 28, p. 1) Additionally, AMCO issued Bloodworth Policy Numbers ACP CAA 7102204036, ACP CAA 7112204036, ACP CAA 7122204036, ACP CAA 7132204036, ACP CAA 7142204036, ACP CAA 7152204036, ACP CAA 7162204036, ACP CAA 7172204036, ACP CAA 7182204036, and ACP CAA 7192204036 for consecutive

one-year periods from May 31, 2006 to May 31, 2018 (the "Umbrella Policies") (The CGL Policies and the Umbrella Policies have been and are collectively referred to herein as the "Bloodworth Policies"). (Doc. 28, p. 1-2) The Umbrella Policies provide limits of liability of $5,000,000 for each occurrence per policy period, above the limits of the CGL Policies. *Id.* The Bloodworth Policies were active at all times relevant to the allegations contained in the complaints in the Underlying Litigation. S*ee generally*, (Doc. 28)

B. <u>Contents Of Insurance Agreements</u>

The Bloodworth Policies contain standardized language created by the Insurance Services Office, Inc. and used in various insuring agreements across the nation. Although there is commonality shared in these insuring agreements, state interpretation of insurance contracts differs vastly across this country. However, some Courts have had the opportunity to interpret the same or similar language as that within the Bloodworth Policies, as is more fully discussed *infra*.

In relevant part, the CGL Policy provides:

1.      Insuring Agreement
a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply.  We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result…

(Doc. 28, p. 2)

"Bodily injury," is defined within the CGL Policies as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (Doc. 28, p. 3) Notably, in the context of the Underlying Litigation, the CGL policies further state "[d]amages because of 'bodily injury' **include damages claimed by any person or organization for care, loss of services or death resulting at any time from the 'bodily injury'**" (emphasis supplied) (Doc. 28, p. 5-6); (Doc. 1-2, p. 13)

   "Property damage" is defined in the Bloodworth policies as:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it.

(Doc. 28, p. 4)

Pertinently, the Umbrella Policy states:

Coverage A – Excess Follow Form Liability Insurance

1.      Under Coverage A, we will pay on behalf of the 'insured' that part of 'loss' covered by this insurance in excess of the total applicable limits of 'underlying insurance,' provided the injury or offense takes place during the Policy Period of this policy.  The terms and conditions of 'underlying insurance' are, with respect to Coverage A, made a part of this policy except with respect to:
a.      Any contrary provision contained in this policy; or
b.      Any provision in this policy for which a similar provision is not contained in 'underlying insurance'.

7

(Doc. 28, pp. 5-6)

C. Bloodworth's Inclusion in the Opioid Litigation

As the harm caused by opioid abuse ravaged communities across the United States, some municipalities as well as States began filing lawsuits against all entities allegedly involved in what became known as the "Opioid Crisis" or "Opioid Epidemic". *See, e.g.*, (Doc. 14-11) The defendants included opioid producers and manufacturers, the distributors that sold opioids to pharmacies, and the pharmacies that then sold opioids to those in their respective communities. *See, e.g.*, (Doc. 28, p. 6-9) Bloodworth, as a wholesale distributor of generic pharmaceuticals, including opioids, was sued and has been designated as a "non-litigating defendant" in the Underlying Litigation. *See generally* (Doc. 28)

Between October 27, 2017, and April 2, 2019, Bloodworth was named as a defendant in twenty-six different lawsuits. *See* (Doc. 28, p. 6-9) Twenty-four of the lawsuits were initiated by governmental entities. *See* (Doc. 28, p. 9). Two of the lawsuits were initiated by hospital organizations and medical management companies. All of the lawsuits listed in the Insurers' amended complaint have been filed or transferred to the Northern District of Ohio as part of the multi-district litigation ("MDL") known as *In Re: National Prescription Opiate Litigation*, Lead Case No. 1:17-md-02804-DAP. (Doc. 28, p. 9)

8

The allegations in the complaints in the Underlying Litigation stem from self-purported "economic losses," at least in part, suffered by the governmental entities, hospital organizations, and a medical management company. (Doc. 28, p. 9) Highly disputed is whether the economic loss alleged by the governmental entities may, at least in part, constitute damages because of bodily injury or property damage. (*Id.*) As expressed by the plaintiffs in the Underlying Litigation, the damages generally include costs associated with "**providing medical care**, additional therapeutic and prescription drug purchases, and **other treatments for patients suffering from opioid-related addiction or disease, including overdoses and death** . . ." (Doc. 28, p. 9-10) (emphasis added) Further, the plaintiffs in the Underlying Litigation likewise seek damages including the loss of services and resources such as the loss of law enforcement services and by virtue of Counties having to use their resources in relation to opioid use and abuse. *See, e.g.*, (Doc. 14-11 p. 261) Based on the litany of overt references to physical harm on behalf of citizens of the various governmental entities and for reasons laid out in Section I, B of this Brief's "Argument and Citation to Authority," it is exceedingly evident that the complaints in the Underlying Litigation indeed allege damages "because of 'bodily injury' or 'property damage'" and constitute an "occurrence" under the terms of the Bloodworth Policies.

9

D. Insurers' Reservation of Rights

Upon being served with the first of the twenty-six lawsuits in the Underlying Litigation, Bloodworth placed the Insurers on notice of the Underlying Litigation. *See* (Doc. 31-2, p. 2) While the Insurers have defended Bloodworth in the Underlying Litigation, they have done so under multiple reservation of rights letters *Id.*; *see Reservation of Rights* (Doc. 14-25 through Doc. 14-29) The Insurers have, as is the prerogative of insurers, affirmatively responded that they do not believe they have any coverage obligation to Bloodworth with respect to the Underlying Litigation. (*Id.*) In so doing, the Insurers have raised the same defenses raised by insurers across the country in the similar litigation in response to claims for opioid-related liabilities. *See* (*id.*)

Specifically, the Insurers have argued, erroneously, that there is no coverage for the Underlying Litigation because the complaints do not seek damages "because of bodily injury," and therefore the Insurers do not have an obligation to defend Bloodworth in the Underlying Litigaiton or indemnify Bloodworth should a judgment be entered against it in any of the complaints within the Underlying Litigation. (*Id.*) As outlined below, numerous courts across the country have held insurers subject to similar contractual provisions have a duty to defend as well as a duty to indemnify in similar type opioid litigation across the county. This is certainly important because if the alternative was true—if Bloodworth is required to pay its

10

defense and judgments rendered against it—such a result would assuredly be catastrophic to Bloodworth's existence. (Doc. 31-2, p. 2)

E.  <u>Settlement of Claims Connected to the Underlying Litigation</u>

Other defendants included within the Underlying Litigation have since settled their claims with the State of Georgia and other local governmental entities. *See* Office of Governor Brian P. Kemp, Order 05.18.23.03 "Establishing and appointing members to the Georgia Opioid Settlement Advisory Commission" (May 18, 2023), https://gov.georgia.gov/executive-action/executive-orders/2023.

Pursuant to this settlement and the need for this settlement, the State of Georgia enacted O.C.G.A. § 10-13B-3, which bars future litigation related to certain lawsuits which arose from the opioid epidemic, and creates administrative entities charged with the appropriation of the funds from this settlement. *See id.* Notably, the Georgia Legislature in conjunction with the Executive Orders has identified within O.C.G.A. § 10-13B-1 the very real need for those settlement funds, and how those settlement funds would be allocated. The need for the settlement funds, as well as how those funds would be allocated, is alluded to and incorporated by Governor Kemp's specific reference to the Memorandum of Understanding within his Executive Order. *Id.* Reflective of the intent of the Georgia Assembly, the purpose of the settlement funds is for, *inter alia*:

> [P]revention and **treatment of opioid addiction and related disorders**; providing resources to law enforcement agencies to address

11

the opioid crisis; increasing the number of professionals who provide treatment for opioid addiction; educating medical professionals regarding the safe and effective prescribing of, and then tapering off of, opioids; and **treatment and prevention of opioid use disorder in incarcerated populations** . . . .

O.C.G.A. § 10-13B-1 (emphasis added).

## III.    Standard of Review[1]

This Court has previously stated the applicable standard of review as follows:

> We review *de novo* a district court's grant of a motion for summary judgment. Summary judgment is appropriate where there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law. We view all evidence and reasonable factual inferences drawn therefrom in the light most favorable to the party opposed to the motion.

*Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1060 (11th Cir. 1994) (internal citations omitted); *see also Great Lakes Ins. SE v. Wave Cruiser LLC*, 36 F.4th 1346, 1352 (11th Cir. 2022). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must draw all reasonable inferences in favor of the non-moving party. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

---

[1] Bloodworth highlights this standard of review is applicable to Bloodworth's Argument Section I and II(B). Bloodworth's Argument Section II(A) need be reviewed under an abuse of discretion standard of review, as also indicated within the body of Section II(A).

## SUMMARY OF ARGUMENT

The District Court erred in granting summary judgment to Insurers. Specifically, the District Dourt erred in finding that the complaints in the Underlying Litigation did not seek damages "because of 'bodily injury' or 'property damage,'" in clear contradiction with Georgia caselaw. First, the Georgia Court of Appeals has held, as a matter of law, that the phrase "because of 'bodily injury,'" is ambiguous. Because Georgia courts have determined the phrase "because of 'bodily injury'" to be ambiguous, the District Court should have construed the ambiguity against the drafter—the Insurers. Moreover, the harms alleged within the Underlying Litigation indeed seek damages "because of 'bodily injury,'" as the Underlying Litigation allege harm directly stemming from "overdoses and deaths." Georgia courts have also found that "damages because of 'bodily injury,'" include punitive damages, which have also been alleged in the Underlying Litigation.

The District Court further erred in prematurely determining, prior to either party substantively briefing the issue or their respective argument thereto, that the complaints in the Underlying Litigation failed to allege an "occurrence", as defined by the Bloodworth Policies, thereby negating coverage under the Bloodworth Policies. In its Amended Discovery and Scheduling Order (Doc. 23), the parties and District Court agreed to bifurcate the insurance coverage issues into two separate and distinct phases of summary judgment briefing. The second phase would only be

13

reached if Bloodworth survived summary judgment on the issue of whether the complaints in the Underlying Litigation alleged damages "because of 'bodily injury' or 'property damage.'" (Doc. 23) The second phase of summary judgment briefing, which would also include the reopening of discovery for sixty days, would specifically address, among other items, whether the complaints in the Underlying Litigation alleged an "occurrence," as defined by the Bloodworth Policies. (Doc. 23) Before ruling on the parties' first motion for summary judgment, the Court solicited supplemental briefs for argument as to whether the term "occurrence" *modified, limited or enhanced* or in some way affected the meaning of the phrase "because of 'bodily injury.'" (Doc. 41) Specifically, the Court stated the request for supplemental briefing was not to solicit briefing as to the "discrete matter as to 'occurrence' as to any particular claims". (Doc. 40) Both parties addressed the District Court's request for supplement on this limited, novel issue. (Docs. 42-44)

Astonishingly, without authorizing either party[2] to submit substantive briefing on whether the Underlying Litigation alleged an "occurrence," the District Court, in its March 27, 2024 Order, found that the particular claims in the Underlying

---

[2] The Court stated in not less than three instances it did not want briefing on whether the allegations within the complaints in the Underlying Litigation constituted an "occurrence." Bloodworth complied strictly with the Court's Order addressing only whether "occurrence" modified the term "because of 'bodily injury' or 'property damage'. Insurers, however, used all seven pages of its briefing to substantively argue whether the complaints in the Underlying Litigation alleged an "occurrence". *See generally*, (Doc. 44).

Litigation did not allege an "occurrence." (Doc. 45, pp. 13-17) Specifically, "[s]uch alleged conducts do not fit the definition of "occurrence," which the Policies define as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.*, p. 15)  The District Court even basing any part of its Order on a finding that "[s]uch alleged conducts do not fit the definition of 'occurrence,'" deprived Bloodworth of due process, was clearly an abuse of discretion, and most assuredly caused harm to Bloodworth.

Accordingly, the district court incorrectly granted summary judgment to Insurers, and this Court should (1) reverse the district court's finding that the Underlying Litigation does not allege harm "because of 'bodily injury'" and (2) remand the issue of whether there was an "occurrence" to be fully briefed by both parties.

<u>ARGUMENT AND CITATIONS OF AUTHORITY</u>

**I.     The District Court Incorrectly Found the Underlying Litigation Did Not Allege "Damages Because of 'Bodily Injury' or 'Property Damage.'"**

No matter how artful the complaints in the Underlying Litigation were pleaded in order to circumvent certain statutes of limitation, it is abundantly apparent the complaints allege damages "because of 'bodily injury' or "property damage.'" As shown *infra*, the District Court erred in disregarding binding Georgia law and adopted an overly restrictive interpretation of the phrase "because of 'bodily injury'

15

or 'property damage'" that contradicts Georgia law. This gross departure from Georgia law necessitates reversal.

A. <u>The District Court ignored Georgia law in determining "because of 'bodily injury' or 'property damage' " is not ambiguous.</u>

The District Court correctly determined that Georgia law applies in this case of insurance contract interpretation. *See* (Doc. 45, p. 8); *see also Provau v. State Farm Mut. Auto. Ins. Co.*, 772 F.2d 817, 819 (11th Cir.1985). Georgia law is clear that the "construction [of a contract] is a matter of law for the court." *Envision Printing, LLC v. Evans*, 336 Ga.App. 635, 786 S.E.2d 250, 252 (2016). Construction of an insurance contract requires three steps:

> First, the trial court must decide whether the language is clear and unambiguous. If it is, no construction is required, and the court simply enforces the contract according to its clear terms. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

> *Id.*

Perplexingly, after determining Georgia law applied, the District Court found the Bloodworth Policies to be clear and unambiguous. *See* (Doc. 45, pp. 8-10) This ruling is categorically at odds with Georgia law. *See Lunceford v. Peachtree Cas. Ins. Co.*, 230 Ga. App. 4, 495 S.E.2d 88 (1997). In *Lunceford*, the court, without hesitation, determined that "because of 'bodily injury' or 'property damage'"—the

16

exact phrase at issue here—was ambiguous. Specifically, in *Lunceford*, the court reasoned:

> Here, like the word "for" in *Greenwood*, the phrase "because of bodily injury or property damage" could reasonably be construed as meaning damages "equivalent to" or "to the extent of" compensation for bodily injury. In other words, the phrase could mean that the insurer would pay only those damages equal to the amount of damages for bodily injury or property damage. But as in *Greenwood*, another construction could be that the phrase means "by reason of" or "on account of." Under this alternative interpretation, the insurer would be required to pay for all damages for which the insured is legally liable because a claimant was injured or his property damaged, including punitive damages. This construction, too, is reasonable. And where two or more constructions are possible, even if they are logical, the contract is ambiguous and must be construed against the insurer. *Greenwood*, *supra* at 316, 232 S.E.2d 910. *See generally Hurst v. Grange Mut. Cas. Co.*, 266 Ga. 712, 716(4), 470 S.E.2d 659 (1996). Accordingly, **the phrase "because of bodily injury or property damages" must be construed against Peachtree as providing coverage** for punitive damages under the latter interpretation.

230 Ga. App. at 7 (emphasis added). The District Court attempts to justify its incorrect reasoning that *Lunceford* did not categorically find the phrase "because of 'bodily injury' or 'property damage'" was ambiguous by citing a case which was determined eleven years prior to *Lunceford*. The District Courts's argument that an exclusively "emotional injury" would not constitute "bodily injury" is unavailing. This is largely because the Courts and laws in Georgia simply do not recognize that a strictly emotional injury constitute a "bodily injury," other than in exceptionally limited circumstances wherein there is a physical manifestation caused by the emotional injury. The District Court's reasoning is, essentially, where no cause of

17

action is recognized, there can be no recovery under an insurance policy, and therefore the Bloodworth Policies are not ambiguous. This reasoning misses the mark in almost every respect. Indeed, the Eleventh Circuit has already adopted *Lunceford*'s reasoning that the term "because of bodily injury" is ambiguous because the term can be construed two ways. *See Pacific Employers Ins. Co. v. Cesnik*, 219 F.3d 1328, 1331 (11th Cir. 2000).

Unequivocally, *Lunceford* held the term "for bodily injury" and "because of bodily injury" can both be ambiguous, and in construing ambiguous language in insurance contracts, those ambiguities must be construed against the drafter. 230 Ga. App. at 7. *Lunceford* does not hold that "because of bodily injury" was only ambiguous as it pertained to Lunceford's policy. *Id.* Other district courts within Georgia have adhered to *Lunceford*'s reasoning. *See Evanston Ins. Co. v. Mellors*, 141 F. Supp. 3d 1367, 1379 (S.D. Ga. 2015) (finding coverage for punitive damages was not excluded after reasoning that "where two or more constructions are possible, even if they are logical, the contract is ambiguous and must be construed against the insurer."). While Bloodworth acknowledges that no Georgia court has directly ruled on interpretation of the Bloodworth Policies within the landscape of the nationwide opioid litigation[3], the District Court's failure to abide by binding Georgia law that

---

[3] Bloodworth notes that there are other disputes within the Eleventh Circuit that concern the nationwide opioid litigation with this appeal being the first to reach the

requires a finding that the phrase "because of 'bodily injury' or 'property damage'" is ambiguous nevertheless warrants reversal.

Moreover, the District Court misstates the standard required to find contractual language ambiguous. In its Order, the District Court held that "[a] provision is ambiguous if the policy <u>must</u> be "fairly understood" in more than one way because there is more than one reasonable interpretation of it." (Doc. 45 p. 8) (citing *Ace Am. Ins. Co. v. Wattles Co.*, 930 F.3d 1240, 1252 (11th Cir. 2019)). But this standard exceeds the one accepted in Georgia. *See Lunceford*, 230 Ga. App. at 7 (1997) ("And where two or more constructions *are possible*, even if they are logical, the contract is ambiguous and must be construed against the insurer.") (emphasis added); *Certain Underwriters at Lloyd's of London v. Rucker Const., Inc.*, 285 Ga. App. 844, 848 (2007). ("Where a term of a policy of insurance *is susceptible* to two or more constructions, even when such multiple constructions are all logical and reasonable, such term is ambiguous . . . .") (emphasis added). By arbitrarily elevating the standard a court must use in assessing contractual ambiguity, the District Court wrongfully penalized Bloodworth.

---

Eleventh Circuit. Because insurance weighs heavily on a particular state's interpretation of common contractual language, Bloodworth recognizes the potential benefit of having the Supreme Court of Georgia provide clarification on the contractual language being disputed herein, as other states have done, such as Delaware (*ACE Am. Ins. Co. v. Rite Aid Corp.*, 270 A.3d 239 (Del. 2022)) and Ohio (*Acuity v. Masters Pharm., Inc.*, 2022-Ohio-3092, 169 Ohio St. 3d 387, 205 N.E.3d 460).

19

It is entirely "logical and reasonable" for the phrase "because of 'bodily injury' or 'property damage'" to mean the costs of emergency medicine for the treatment of a person who overdosed on opioids. *Cf. Rucker Const., Inc.*, 285 Ga. App. at 848. In the Underlying Litigation, the plaintiffs provide statistics about the toll of the epidemic—the many thousands of people addicted to opioids, suffering from opioid use disorder and other diseases, and the many thousands who have died. *See, e.g.*, (Doc. 14-11, p. 27) Though, the Underlying Litigation do not list any specific individuals by name, or allege who became addicted and when, and who died and when, the complaints allege ad nauseam a litany of bodily injuries and damages stemming directly from the treatment of those bodily injuries. (*Id.*) Those individuals still represent particularized instances of bodily injury. (*Id.*) Further, and as indicated above, this Court should analyze the complaints in context, and most notably in the context of the settlement agreement and memorandum of understanding incorporated by the State of Georgia wherein certain percentages are carved out specifically for treatment of individuals for their opioid related injuries, or more aptly the damages because of bodily injury.

Instead of relying on *Lunceford*, the District Court relied on *Cesnik*, 219 F.3d at 1331.[4] The Insurers pointed to *Cesnik*, as being relevant to the District Court's

---

[4] Albeit the District Court does largely ignore the holding within *Cesnik* wherein this Court specifically held that "because of bodily injury" can be construed in two ways: one narrow and one broad. Such constitutes innate ambiguity. 219 F.3d at 1331.

analysis. *Id.* However, the facts in *Cesnik* are easily distinguishable to the facts alleged in the Underlying Litigaiton. *Id.* The plaintiffs in *Cesnik* sought *contractual* damages for emotional distress against the insured adoption agency after adopting two infants that the agency had represented as healthy but in fact were disabled. *Id.* In effect, plaintiffs sought mental and emotional damages, but their pleadings revolved solely around breach of contract, as their tort claims had been barred by the applicable statute of limitations. *Id.* The court held that damages for mental and emotional pain did not constitute claims for damages because of bodily injury as defined in the policy and required a "connection between the damages sought and a covered bodily injury." *Id.*; *see also Auto-Owners Ins. Co. v. Ralph Gage Contracting, Inc.*, 748 Fed. Appx. 967 (11th Cir. 2018) (no duty to defend where insured was sued for negligent inspections, but the inspections were not alleged to have caused property damage). Further, the plaintiffs in *Cesnik* did not actually demand damages for any particular bodily injury, but instead demanded only damages for breach of contract. 219 F.3d at 1331. The damages sought were "only contractual damages." *Id.* And "liability, if any, for these damages would result from a breach of contract," and not a bodily injury. *Id.*

Here, it is undisputed and actually stipulated by the parties that at least some of the damages sought in the Underlying Litigation are:

> [C]osts (as well as unreimbursed and uncompensated costs) *for providing medical care*, additional therapeutic and prescription drug

21

purchases, and other *treatments for patients suffering from opioid-related addiction or disease*, including overdoses and deaths; costs (as well as unreimbursed and uncompensated costs) for providing treatment, counseling, and rehabilitation services; and costs (as well as unreimbursed and uncompensated costs) for *providing treatment of infants born with opioid-related medical conditions*.

(Doc. 28, p. 9-10) (emphasis added) Moreover, those allegations for damages for medical treatment against Bloodworth arise in times out of claims of negligence as well as public nuisance, as is more fully discussed, *infra*. (*Id.*)

Much of Georgia caselaw that has found a loss was economic in nature, as opposed to there being a bona-fide "bodily injury," are centered on the underlying dispute being based in contract, as was *Cesnik*. 219 F.3d at 1331; *Southeastern Color Lithographers, Inc. v. Graphic Arts Mut. Ins. Co.*, 164 Ga. App. 70, 71, 296 S.E.2d 378 (1982) (holding "the losses allegedly suffered by the plaintiff in this breach of contract action are not property damages and are not covered by the appellant's insurance policy."). Here, the nature of the loss in the Underlying Litigation does not reflect a dispute in contract. *See* (Doc. 28, p. 9-10) Instead, there is a clear "connection" between the damages sought and the bodily injury. Lest not this Court disregard the entirety of the insuring agreement language, "[w]e will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Doc. 28, p. 2)

If it were not for the deaths and physical injuries sustained by citizens residing within the communities of the plaintiffs in the Underlying Litigation, then there

would be no bodily injury and thus no damages. Moreover, without that bodily injury and death, the government entity plaintiffs would not have lost the use of their resources such as the use of emergency services and therefore suffered no property damage losses. This Court should instead embrace an alternative conclusion reached in *Cesnik*—in that this Court should not reward artful pleadings that evade or artificially substantiate the allegations made within the complaints in the Underlying Litigation. 219 F.3d at 1332.

Simply put, *Lunceford* is binding, enforceable Georgia law. The cases upon which Insurers' arguments rely are distinguishable to the very unique facts presented in this action.  The District Court's departure from binding, enforceable Georgia law constitutes reversible error and requires reversal.

B. <u>The District Court erroneously determined the Underlying Lawsuits did not constitute harm "because of 'bodily injury' or 'property damage'" in accordance with Georgia law.</u>

"If the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred." O.C.G.A. § 13-2-2(5); *see also Georgia State Financing & Investment Com'n v. XL Specialty Ins. Co.*, 303 Ga. App. 540 (2010); *Parham v. Peterson, Goldman & Villani*, 296 Ga. App. 527 (2009); *Department of Comm. Health v. Pruitt Corp.*, 295 Ga. App. 629 (2009). Federal courts have applied to this principle. *See*

23

*Giles v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 578 F. Supp. 376 (M.D. Ga. 1984).

Under Georgia law, to determine whether an insurer has a duty to defend, the Court "compare[s] the allegations of the complaint, as well as the facts supporting those allegations, against the provisions of the insurance contract." *Cesnik*, 219 F.3d at 1330 (11th Cir. 2000); *SCI Liquidating Corp. v. Hartford Fire Ins. Co.*, 181 F.3d 1210, 1214 (11th Cir. 1999).

Here, the vast majority of allegations contained within the Underlying Litigation, albeit artfully pleaded, while seeking "economic damages" in reality assert harm and damages that are inextricably connected to "bodily injury." *See* (Doc. 28, p. 9-10) Specifically, the complaints in the Underlying Litigation are filled with allegations about the injury, sickness, disease, and death that the opioid epidemic has caused in various communities: opioid overdoses, addiction, injuries to children and adults, and thousands and thousands of deaths. *See, e.g.*, (Doc. 28, p. 9-10) Moreover, and unquestionably the lawsuits in the Underlying Litigation specifically pray for damages which include costs (as well as unreimbursed and uncompensated costs) for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; costs (as well as unreimbursed and uncompensated costs) for providing treatment, counseling, and

24

rehabilitation services; and costs (as well as unreimbursed and uncompensated costs) for providing treatment of infants born with opioid-related medical conditions. (*Id.*)

Since "because of 'bodily injury' or 'property damage'" is ambiguous, Bloodworth is entitled to a more deferential interpretation of the Bloodworth Policies. *See* O.C.G.A. § 13-2-2(5). If the District Court would have applied a more favorable interpretation of the phrase "because of 'bodily injury,'" the District Court would have ultimately found at least some of the damages alleged in the complaints in the Underlying Litigation are damages "because of 'bodily injury' or 'property damage'" and allowed coverage. Bloodworth has not ever asserted every single item of damages is or may be indemnifiable under the Bloodworth Policies, however, to the extent any of the allegations within the complaints in the Underlying Litigation seek damages because of bodily injury or property damage, the District Court erred.

For example, the fact that government entities providers are the plaintiffs in the Opioid Lawsuits (Doc. 28, p. 9), and not the individuals who actually suffered the bodily injury, does not matter because the Policies all state that "[d]amages because of 'bodily injury' include damages claimed by any person or organization for care, **loss of services**, or death resulting at any time from the 'bodily injury.'" (Doc. 1-2, p. 13) (emphasis added). Inexplicably, this portion of the definition of "damages because of 'bodily injury'" is wholly ignored by the District Court for its more strained reading and analysis that the Bloodworth Policies are not ambiguous.

25

"Loss of services" is likewise plead in complaints within Underlying Litigation. *See, e.g.*, (Doc. 14-11, pp. 246-47 ("870. **As a direct and proximate result of Defendants' negligence per se, the County has suffered and continues to suffer injury, including but not limited to incurring excessive costs related to** diagnosis, treatment, and cure of addiction or risk of addiction to opioids, **bearing the massive costs of these illnesses and conditions by having to provide necessary resources for care, treatment facilities, and law enforcement services** for County Residents and using County resources in relation to opioid use and abuse.") (emphasis added).

As discussed *infra*, the complaints in the Underlying Litigation allege damages "because of 'bodily injury' or 'property damage'" because (1) the Bloodworth Policies are ambiguous, as is further evidenced by the 2013 amendment, and (2) the national settlement expressly contemplates allocation of funds to address the effect of actual, physical harm from opioid-related injuries.

     *i.*    *The Bloodworth Policies are ambiguous because the Insurers could have included a specific exclusion.*

Importantly, in construing the Bloodworth Policies as a whole, the 2013 amendments to the Bloodworth Policies reveal Insurers' concern regarding coverage for the exact types of injuries alleged in the Underlying Litigation in the face of the growing opioid epidemic. Beginning in May 2013 the CGL Policies began to

purportedly contain[5] an endorsement which modified the insurance provided under the Commercial General Liability Coverage Part to exclude "bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of Prescription Pharmaceutical Sales (Doc. 14-1 pg. 45) "In ascertaining the parties' intention, we are directed 'to consider the insurance policy as a whole' and seek a construction that 'will give effect to each provision, attempt to harmonize the provisions with each other, and not render any of the policy provisions meaningless or mere surplusage.'" *Ace Am. Ins. Co. v. Wattles Co.*, 930 F.3d 1240, 1252 (11th Cir. 2019) (citing *Nat'l Cas. Co. v. Georgia Sch. Boards Ass'n-Risk Mgmt. Fund*, 304 Ga. 224, 227, 818 S.E.2d 250, 253 (2018)). "Georgia courts also rely on other contextual clues when attempting to discern the intention of the parties." *Id.*; *see also Nationwide Mut. Fire Ins. Co. v. Kim*, 294 Ga. App. 548, 669 S.E.2d 517 (2008) (liability policy did not expressly and specifically exclude liability coverage for punitive damages, thus exclusion in liability policy for intentional acts did not operate to exclude coverage for punitive damages).

---

[5] Whether Bloodworth actually received notice of the exclusion and whether it was actually incorporated into the Bloodworth Policies is likewise a subject of dispute which will be addressed during the second phase of discovery and summary judgment briefing. However, for the purposes of this argument, the fact that Insurers contend it is applicable within the Reservation of Rights correspondence is applicable to Bloodworth's argument concerning surplusage.

27

It is absolutely the Insurers' position that the allegations in the complaints in the Underlying Litigation were already excluded prior to the Exclusion – Designated Products Endorsement; it would thus be fundamentally illogical to clarify the agreement's language in 2013 by adding a specific exclusion.  In other words, if as the District Court has held, as the Insurers have argued, that the claims within the complaints in the Underlying Litigation do not allege damages because of bodily injury, then there is no reason for the 2013 Endorsement because such language is redundant, and surplusage. Of course, what likely occurred is that the Insurers knew the likelihood that the bodily injuries sustained by millions of individuals  as the result of the nationwide opioid epidemic could result in substantial claim payments and dashed to include more exclusive language to avoid—both providing a defense as well as providing indemnification to insureds such as Bloodworth.. At bottom, "context[] clues" prove that Insurers altered the Bloodworth Policies to specifically include pharmaceutical sales in 2013 because Insurers believed (1) ambiguity was contained within prior versions of the agreement or (2) there was demonstrable coverage of "bodily harm" stemming from pharmaceutical sales in all policies prior to the 2013 amendment. *Id.*

ii.    *The national settlements demonstrably reveal the Underlying Litigation's ultimate aim for recovering damages "because of 'bodily injury'".*[6]

As discussed, plaintiffs in the Underlying Litigation guilefully pleaded in a manner that is evasive to certain statutes of limitations. This tactic has been specifically noted by at least one other court. *See ACE Am. Ins. Co. v. Rite Aid Corp.,* 270 A.3d 239 (2022) at 255-56 (Vaughn, J. dissenting). The fact that the complaints are artfully pleaded to avoid statutes of limitation has not, however, resulted in funds being diverted from bodily injury and/or medical bills and treatment. (Doc. 14-11)

"[I]n interpreting the Executive Order, we must consider its text in the legal context in which it was issued . . . ." *Resurgens, LLC v. Ervin*, 369 Ga. App. 675, 679, 894 S.E.2d 408, 411 (2023), cert. denied (May 29, 2024). In Georgia, Governor Brian Kemp ratified SB 500 (now O.C.G.A. § 10-13B-3), which, in effect, codifies certain terms of the settlement with larger opioid manufacturers, by way of executive order and public release.[7] In his public ratification, Governor Kemp identifies the importance and reason for the statute:

---

[6] Bloodworth acknowledges the scope of this proceeding in that it is based on a declaratory judgment action and not the substantive merits of the Underlying Litigation. However, this Court need not ignore the fact that funds appropriated by any settlement of this action will likely be appropriated in a similar manner to that of the prior settlements, which specifically contemplate allocating funds to mitigating opioid-related harms "because of 'bodily injury.'"

[7] OFFICE OF GOVERNOR BRIAN P. KEMP, *Gov. Kemp Signs Major Opioid Legislation to Secure $636 Million for Treatment and Prevention*, https://gov.georgia.gov/press-releases/2022-05-02/gov-kemp-signs-major-opioid-legislation-secure-636-million-treatment-and (last visited on July 3, 2024).

Fatal and non-fatal drug overdoses have been increasing nationally and in Georgia in recent years and throughout the COVID-19 pandemic. From 2019 to 2021, fatal drug overdoses in Georgia increased by 55.9 percent – representing the loss of 2,327 lives. Opioids, specifically fentanyl, appear to be driving these increases. During this same time period, fentanyl-involved overdose deaths increased by 218.4 percent – representing the loss of 1,248 Georgia lives.

*Id.*

Similarly, in O.C.G.A. § 10-13B-1, the General Assembly outlined its legislative intent for O.C.G.A. § 10-13B-3 and determined "[s]tate-wide coordination surrounding and managing opioid addiction and related disorders is **critical to the health and safety of all Georgians**." O.C.G.A. § 10-13B-1(2).

It is abundantly obvious—the allegations in the Underlying Litigation superficially allege economic loss, but the true harm—for which settlements are being reached and the funds therefrom being distributed—is the fatal and nonfatal injuries suffered by those within plaintiffs' communities. While the plaintiffs in the Underlying Litigation do not specifically name individuals who have died or who were injured by opioid overdose, the bodily injury exists, and the Complaints unequivocally seek damages because of that bodily injury. If it were not for the opioid overdoses, then there would be no damages sought. Ergo, it is impossible to reconcile what the Insurers assert and reality—that there are no damages "because of 'bodily injury'" alleged in the Underlying Litigation. Certainly, it is impossible to reconcile when funds from the national opioid settlements are being directly

30

appropriated for addressing the effects of opioid-related injuries. *See Johnson v. Niehus*, No. CV 105-125, 2008 WL 11417673, at *6 (S.D. Ga. Sept. 30, 2008) ("[T]he rule follows where its reason leads; where the reason stops, there stops the rule.") (quoting KARL LLEWELYN, THE BRAMBLE BUSH 157-58 (Oceana, 1951 ed.)).

C. <u>Decisions from Across the Country in Jurisdictions with Laws Similar to Georgia have found allegations similar to the Underlying Litigation to allege "because of 'bodily injury.'"</u>

Courts are certainly split concerning the applicability of commercial general insurance policies in the context of opioid litigation. Other jurisdictions have, however, found the allegations similar to those in the Underlying Litigation to allege damages "because of 'bodily injury,'" which is further indication of the interpretation being "logical and reasonable." *Rucker Const., Inc.*, 285 Ga. App at 848. In the first case by a U.S. Court of Appeals to consider these issues, the Seventh Circuit in *Cincinnati Ins. Co. v. H.D. Smith*, L.L.C., 829 F.3d 771 (7th Cir. 2016), found that the policyholder in that case was entitled to coverage in the opioid litigation it faced. The State of West Virginia sued the policyholder, a pharmaceutical distributor, "for contributing to the state's epidemic of prescription drug abuse" by "negligently distribut[ing] drugs." *Id.* at 773, 775. The State alleged that "money was spent caring for drug-addicted West Virginians who suffer drug-related injuries and cannot pay for their own care." *Id.* at 773.

Similarly, in *AIU Ins. Co. v. McKesson Corp.*, 598 F. Supp. 3d 774 (N.D. Cal. 2022), the court also considered substantively identical policy language in the context of coverage: seeking damages "because of" bodily injury, bodily injury defined as "bodily injury, sickness or disease sustained by any person, including death," and the language that "[d]amages because of Bodily Injury include damages claimed by any person or organization for care, loss of services or death resulting at any time from the Bodily Injury." *Id.* at 779–80. And in *AIU*, the court considered whether allegations in complaints that are part of the opioid MDL and have the same or similar allegations to those brought against Bloodworth in the Underlying Litigation qualified for coverage under that language. *Id.* at 784–85. The *AIU* court found that because "the event precipitating the legal action is 'bodily injury;' [t]he costs that result from such action are therefore incurred 'because of bodily injury.'" *Id.* at 785.

Multiple other courts have held that the allegations in the opioid MDL, under identical policy language, also constitute claims for damages "because of bodily injury." In *AmerisourceBergen Drug Corp. v. ACE American Ins. Co.*, 2020 W. Va. Cir. LEXIS 3 (Jan. 7, 2021) ("ABDC"), the Circuit Court of West Virginia summarized, again, nearly identical policy language to that used in the Bloodworth Policies, but also stressed that the policy at issue "does not contain any term or condition that excludes or limits insurance coverage if the plaintiff in the underlying

32

lawsuit is a government entity," "does not contain any term or condition that excludes or limits insurance coverage if the plaintiff in the underlying lawsuit did not directly suffer bodily injury or property damage," and "does not contain any term or condition that excludes or limits insurance coverage for 'economic losses' or 'economic damages.'" The Bloodworth Policies similarly have no such language that would actually support the arguments that the Insurers have sought to make. The court then concluded that "[a]s a matter of law, these claims establish that the State of West Virginia claimed damages in the WVAG Lawsuit for 'bodily injury,' as that term is defined in the [relevant] Policy." *Id.* at *23; *see also Giant Eagle, Inc. v. Am. Guar. & Liab. Ins. Co.*, 499 F. Supp. 3d 147, 166 (W.D. Pa. 2020) ("Despite the fact that the plaintiffs in the County lawsuits do not allege that they suffered bodily injury or property damage, they do seek damages because of bodily injury. Thus, the complaints in the County lawsuits allege bodily injuries, and arguably seek damages because of bodily injury, and the arguments to the contrary raised by [the insurers] are without merit."), vacated on other grounds, 2021 WL 6276267 (W.D. Pa. May 25, 2021).

Most recently, in *Walmart, Inc. v. ACE American Ins. Co., et al.*, Case No: 04CV22-2835-4 (Ark. Cir. Ct. December 29, 2023), the court also found the allegations contained within lawsuits similar to the Underlying Litigation to allege damages "because of 'bodily injury.'" There, the court relied on an Arkansas

33

Supreme Court case that distinguished lawsuits sounding in breach of contract or some other independent breach, in which allegations of bodily injury and property damage are merely "lurking somewhere in the underlying case" from cases where bodily injury was the "nature of type of liability" faced by the policyholder in the underlying suit. *Unigard Sec. Ins. Co. v. Murphy Oil USA, Inc.*, 331 Ark. 211, 227, 962 S.W.2d 735, 743 (1998). The court further determined:

> Here, the Representative Suits allege that Walmart's dispensing and/or distribution of opioid medications was a direct proximate cause of bodily injuries to thousands of individuals and property damage. These are not breach of contract cases or cases where allegations of bodily injuries and property damage are merely "lurking" in the background. Rather, they are claims seeking damages, in part, to compensate the plaintiffs for the costs of treatment, care, and related services for the injured individuals. As reflected in the National Settlement, the settlement of many of those suits, including numerous of the Representative Suits, requires that Walmart pay money expressly earmarked for the costs of treatment, care, and related services for those injured individuals.

*Id.*, ¶ 30.

Georgia and Eleventh Circuit law is similarly shaped to that of Arkansas. Both venues have routinely dismissed a policyholder's claim for coverage when the purported harm sounds in breach of contract and "lurk[s] somewhere in the underlying case." *Compare McDonald Const. Co. v. Bituminous Cas. Corp.*, 279 Ga. App. 757, 632 S.E.2d 420 (2006) (holding that contractual obligation to replace delaminated floor tiles was not covered) *with Unigard Sec. Ins. Co.*, 331 Ark. at 227. The District Court even relied on such a case as the foundation for its analysis. (Doc.

34

45); *Cesnik*, 219 F.3d at 1331. Here, though, the alleged bodily injury does not

"lurk[] somewhere in the underlying case." *Walmart, Inc.*, Case No: 04CV22-2835-

4. Instead, bodily injury is the undoubted reason for the economic losses suffered by

the governmental entities. It is for that very reason that this Court should be

persuaded by the distinction in *Unigard*. 331 Ark. at 227.

Admittedly, there is a split among circuits with respect to how each circuit

interprets "because of 'bodily injury' or 'property damage'" within the landscape of

the opioid epidemic—not to mention intrinsic differences between each state's

insurance law. However, the above-discussed decisions all performed detailed

analysis of identical, or substantively identical, policy language and underlying

allegations which has been presented by the Bloodworth's Policies and the

Underlying Litigation and found those allegations seek damages "because of bodily

injury." The same conclusion is warranted here (especially given the ambiguity

within the Bloodworth Policies requiring the language be strictly construed against

the Insurers)—the Underlying Litigation seeks damages "because of 'bodily injury'

or 'property damage'" under the Bloodworth Policies.

To be sure, Bloodworth holds two realities as self-evident. First, the Insurers,

who are both massive companies with millions of insurance policies, could have

included exclusions that would expressly void any coverage—as they tried to do

after-the-fact by way of their 2013 amendment. They did not. Therefore, the

Bloodworth Policies should be read to include coverage for damages alleged in the Underlying Litigation for at least 2006 until the 2013 amendment to the policies.[8] Second, while plaintiffs in the Underlying Litigation concealed their true intentions by artfully including language evasive of implicating coverage and certain statutes of limitations, the language that instructs how the settlement funds will be appropriated, as codified and promulgated in Georgia law, substantiates and confirms Bloodworth's assertion that the Underlying Litigation seeks damages "because of 'bodily injury.'" These conclusions are only further supported by comparable jurisdictions' willingness to find complaints similar to those in the Underlying Litigation seek damages "because of 'bodily injury' or 'property damage.'"

## II.    The District Court Erred in Finding the Underlying Litigation Did Not Allege an "Occurrence."

A. <u>The District Court's Premature Finding that there was not an "occurrence," as defined by the Bloodworth Policies constitutes a Due Process violation.</u>

As explained *supra* in Footnote 1, the standard for review of this section, Section II(A), is reviewed under abuse of discretion. "A district court abuses its discretion when it makes a clear error of judgment or applies an incorrect legal

---

[8] Bloodworth does not concede the validity of the exclusion, nor does it concede it received proper notification of the addition of the endorsement to the Bloodworth Policies.  *See* n.6, *supra.*

36

standard." *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 717 (11th Cir. 2019) (quoting *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1281 (11th Cir. 2015)).

A judgment is void when it is entered in violation of due process because the party was not given notice and an opportunity to be heard. U.S. CONST. AMEND. 14. The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976) (citing *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). The benefit of a hearing or an opportunity to be heard is not merely a matter of grace, but is one of right, which is protected by the due process guarantees of the federal constitution. *Shelley v. Kraemer*, 334 U.S. 1, 68 S. Ct. 836, 92 L. Ed. 1161, 3 A.L.R.2d 441 (1948); *see also Brown v. Georgia Power Co.*, 134 Ga. App. 784, 786, 216 S.E.2d 613, 615 (1975). Meaningful access to the courts is a right of constitutional significance. *See Christopher v. Harbury*, 536 U.S. 403, 415 & n. 12, 122 S.Ct. 2179, 2187 & n. 12, 153 L.Ed.2d 413 (2002).

"[I]ndividuals whose property interests are at stake due to government actions are entitled to notice of the proceedings and an opportunity to be heard." *Mesa Valderrama v. United States*, 417 F.3d 1189, 1196 (11th Cir. 2005) (citing *Dusenbery v. United States*, 534 U.S. 161, 167–68, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002)). "Due process, unlike some legal rules, is not a technical conception with a

fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). The concept "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). There must also be a showing of prejudice before the court can find a violation of due process sufficient to merit a remand. *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir.1995).

When evaluating an alleged due process violation, courts consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

> *Mathews*, 424 U.S. at 335, 96 S.Ct. 893.

As it relates here, the District Court issued its Amended Scheduling Order, which bifurcated the discovery and summary judgment briefing procedure. (Doc. 23, pp. 2-3) The parties would brief and the Court would first determine whether the complaints in the Underlying Litigation alleged harm "because of 'bodily injury' or 'property damage'" (*Id.*) If this issue was resolved in Bloodworth's favor, only then would discovery be reopened to investigate additional coverage issues such as the

38

applicability of exclusions, if any, or to determine whether the complaints in the Underlying Litigation alleged an "occurrence," as defined by the Bloodworth Policies. (*Id.*) To be clear, there was supposed to be an entirely separate discovery period for which the parties would be able to obtain information relevant to each parties' arguments in the second stage of discovery and summary judgment briefing. (*Id.*) Bloodworth reasonably relied upon the District Court's representations in the Amended Scheduling Order.

Bloodworth had a private interest in being able to argue its position that it is owed insurance coverage for over a decade of payment of insurance premiums to the Insurers. However, the District Court, in its Order, erroneously and arbitrarily made a finding that, "[s]uch alleged conducts do not fit the definition of "occurrence," which the Policies define as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 45, p. 15). This finding was inescapably intertwined into the Court's opinion concerning the issue of "because of 'bodily injury' or 'property damage.'" By entering such a finding and relying so heavily upon the finding concerning bodily injury, Bloodworth was stripped of its opportunity to conduct discovery and fully articulate its argument that there was an "occurrence," as defined by the Bloodworth Policies. (Doc. 45, pp. 13-17) The result could be absolutely catastrophic to Bloodworth. The District Court, by prematurely issuing its findings, as it relates to whether there was

39

an "occurrence," "ma[de] a clear error of judgment" and imposed prejudice against Bloodworth, stripping Bloodworth of the opportunity to be heard "at a meaningful time and in a meaningful manner." (*Id.*); *Guevara*, 920 F.3d at 717; *Mathews*, 424 U.S. 319 at 333.

Similarly, reliance on Fed.R.Civ.P. 56(f) for justification of the District Court's ruling is misguided, as the District Court expressly sought information that was not dispositive with respect to the analysis of the term "occurrence," as defined in the Bloodworth Policies and applicable to the Underlying Litigation—thereby not providing the requisite notice. *See In re Fisher Island Invs., Inc.*, 778 F.3d 1172, 1195 (11th Cir. 2015).

Because the District Court incorrectly determined that the Underlying Litigation did not allege damages "because of 'bodily injury'" based upon its finding "[s]uch alleged conducts do not fit the definition of "occurrence," which the Policies define as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," Bloodworth's due process rights were violated, and remand to conduct discovery and fully argue whether there was an "occurrence," as defined by the Bloodworth Policies is the sole, proper remedy. *See* (Doc. 45, pp. 13-17)

B. <u>The Underlying Litigation Satisfies the Definition of "Occurrence".</u>

40

Bloodworth has not argued the discrete matters as to "occurrence" as to any particular claims in this action. Bloodworth was never afforded the opportunity to argue such a position, although the District Court specifically held, "[s]uch alleged conducts do not fit the definition of "occurrence," which the Policies define as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." However, in an effort to establish the harm caused by the District Court's findings, Bloodworth now shows this Court that the complaints in the Underlying Action do in fact allege an occurrence. Notably, the complaints in the Underlying Litigation specifically allege bodily injury because of a public nuisance or at least allege facts which establish a public nuisance. *See* (Doc. 1, pp. 15-30) Further, the complaints allege intentional conduct on behalf of Bloodworth and claim Bloodworth caused a public nuisance. *See* (Doc. 1, pp. 16-36)

The Bloodworth Policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 28, p. 4)

"[U]nder Georgia insurance law, the term 'accident' means 'an event which takes place without one's foresight or expectation or design.'" *Allstate Prop. & Cas. Ins. Co. v. Roberts*, 696 F. App'x 453, 455 (11th Cir. 2017) (quoting *Allstate Ins. Co. v. Grayes*, 454 S.E.2d 616, 618 (Ga. Ct. App. 1995)). "'Accident' and 'intention' are converse terms." *Stein v. Mass. Bay Ins. Co.*, 324 S.E.2d 510, 511 (Ga. Ct. App.

41

1984) (citation omitted). "'Intent' means having a desire to bring about particular consequences which are substantially certain to result from the act." *Allstate Ins. Co. v. Justice*, 493 S.E.2d 532, 535 (Ga. Ct. App. 1997) (citing *W. Am. Ins. Co. v. Merritt*, 456 S.E.2d 225, 226 (Ga. Ct. App. 1995)). "[W]here an act is intentional, it does not constitute an 'accident' as that term is defined in an insurance policy." *Owners Ins. Co. v. James*, 295 F. Supp. 2d 1354, 1363 (N.D. Ga. 2003). As a matter of law, an intentional act is not an event that takes place without the insured's foresight, expectation, or design. *Allstate Ins. Co. v. Neal*, 696 S.E.2d 103, 105 (Ga. Ct. App. 2010).

> i.    *Georgia law requires a finding that there was an "occurrence" as to the nuisance allegations.*

In the nuisance context, Georgia courts have only required that an insured is covered under insurance for the damages caused which were "neither expected nor intended from the standpoint of the insured," in determining whether there was an "occurrence." *Colonial Oil Indust., Inc. v. Underwriters Subscribing to Policy Nos. T031504670, T031504671*, 1995 WL 495991 (S.D. Ga. 1995); *see also Southern Guaranty Ins. Co. v. Saxon*, 190 Ga.App. 652 (1989) (although the insured driver attempted to elude police, he neither expected nor intended to injure a passenger in the process). In *Colonial Oil*, there was a comprehensive general liability insurance policy that limited an insurer's duty to defend to property damage caused by an "occurrence," defined as "an accident, including continuous or repeated exposure to

conditions"—as is present here. *Id.* The court reasoned that the insured was covered for the damages caused by the deposition of contaminated material during dredging, even though the dredging was intentional, because the insured did not expect or intend that the dredging would cause any damage. *Id.* at *10. In essence, the insured "need only prove an absence of *affirmative intent to injure*." *Id.* (emphasis supplied)

Here, numerous of the allegations contained within the complaints in the Underlying Litigation more closely resemble that of environmental-oriented harm, which Georgia courts have only required, from the insured's own standpoint, that the damages the insured allegedly caused were neither expected nor intended. Plaintiffs in the Underlying Litigation allege Bloodworth created or contributed to a public nuisance by way of supplying pharmaceutical requests to local and regional pharmacies. *See* (Doc. 14, p. 16); *Colonial Oil Indust., Inc.*, 1995 WL 495991. Bloodworth did not have the "foresight [or] expectation" that its supply of pharmaceutical requests to local and regional pharmacies would lead or contribute to the nationwide opioid epidemic. *Neal*, 696 S.E.2d at 105. Bloodworth simply receives pharmaceutical orders from pharmacies and fulfills them. Bloodworth does not have direct contact with doctors nor the consumers of the generic opioids which it ships to pharmacies. It was not aware, and vehemently denies, its alleged role within the nationwide opioid epidemic until it was first served with a complaint in 2017. Accordingly, it would be egregiously draconian to threaten Bloodworth with

43

existential and crippling financial harm, as that of a company that deliberately ignored and actively concealed the immensely dangerous effects of opioids. Because there is no reasonable expectation for Bloodworth to have the "foresight [or] expectation" that its suppling of generic pharmaceuticals to pharmacies would lead to the nationwide opioid epidemic and is "absent[] of affirmative intent to injure," this Court must find that there was an "occurrence," as defined by Bloodworth Policies and in accordance with Georgia law. *Neal*, 696 S.E.2d at 105; *Colonial Oil Indust., Inc.*, 1995 WL 495991 at *10.

ii.    *The Underlying Litigation's allegations of non-intentional conduct constitutes an "occurrence".*

Unquestionably, the plaintiffs in the Underlying Litigation allege non-intentional conduct, and Insurers admit such in their Amended Complaint. *See* (Doc. 14, p. 16) ("In their causes of action for public nuisance, negligence, and negligence per se, Plaintiffs 'seek economic losses (direct, incidental, or consequential pecuniary losses) . . . .") This admission in and of itself warrants this Court finding that the complaints in the Underlying Litigation allege conduct which constitutes an "occurrence," considering the Bloodworth Policies' definition of an "occurrence" is, in part, "an accident." (Doc. 28, p. 4) Although there may be allegations of intentional conduct, there are also allegations of negligent conduct, or that Bloodworth knew or reasonably should have known the alleged harms.

44

Alternatively, plaintiffs in the Underlying Litigation pleaded in a manner necessitating a finding there was an "occurrence," as defined by the Bloodworth Policies. Specifically, there are claims of public nuisance, negligence, negligence per se, deceptive trade practices under O.C.G.A. § 10-1-370, false statement in advertising, and a claim for damages for violation of a legal duty. *See, e.g.*, (Doc. 14-5 at pp. 111, 157, 159-60, 163, 166); *see also* (Doc. 14-7, p. 1); *Nationwide Mut. Fire Ins. Co. v. Dillard House, Inc.*, 651 F. Supp. 2d 1367 (N.D. Ga. 2009) (finding allegations that insured negligently or recklessly had failed to safeguard against unsanitary conditions that it knew or should have known existed in hotel's hot tub facility, leading to patron's death by Legionnaire's disease, alleged an occurrence within meaning of commercial general liability (CGL) insurance policy). As an example, most of the complaints in the Underlying Litigation allege the defendants caused a "public nuisance" through intentional, reckless, or negligent conduct. (Doc 14-11 pg. 239) Likewise, most of the complaints in the Underlying Litigation allege the distributor defendants knew, or should have known, opioid prescriptions being filled were likely to be diverted into the plaintiffs' communities. *See* (Doc. 14-5 pg. 83) Although allegations that Bloodworth "knew" anything certainly imply intentional conduct (and therefore not accidental conduct), allegations that Bloodworth "should have known" clearly would and could constitute conduct that is "an accident, including continuous or repeated exposure to conditions" certainly

45

where Bloodworth has denied that it was responsible for or intended any of the purported damages alleged by the plaintiffs in the Underlying Litigation.

      iii.   *Other jurisdictions have found there to be an "occurrence," based on similar allegations.*

Other courts have determined the allegations contained within complaints nearly identical to the complaints in the Underlying Litigation constitute an occurrence. Specifically, in *Walmart, Inc.*, the court determined the complaints, which largely mirror the complaints within the Underlying litigation, alleged conduct which constituted an "occurrence," while also using the identical definition of an "occurrence" as presented here. Case No: 04CV22-2835-4 at 7-11. The court explained that the:

> [L]awsuits include causes of action for negligence and are replete with negligence-based allegations, including that Walmart failed to put in place adequate policies, training, and procedures to prevent improper diversion of opioids. Based on these allegations, there is certainly a "possibility" that Walmart could be held liable in the Representative Suits for alleged harms that it did not "expect" or "intend."

> *Id.*

While there was a slight difference in the underlying agreement, as the Walmart agreement contained an additional provision outlining coverage in the sale of "goods or products," it was not the whole basis of the court's determination that there was an "occurrence." *Id.*; *see also Giant Eagle*, 499 F. Supp. 3d at 168 (holding that similar allegations and claims of negligence, "which clearly do not involve

46

allegations of intentional conduct, sufficiently allege an ['accident' or] 'occurrence'"). To the extent this Court looks to other jurisdictions, Bloodworth urges it to look to the reasoning from the jurisdictions identified herein.

Accordingly, by not allowing the parties to argue whether the allegations contained within the Underlying Litigation constitute an "occurrence," as defined in the Bloodworth Policies, this Court need remand this proceeding to the District Court for further briefing. Alternatively, Bloodworth requests that this Court rule there was an "occurrence," as alleged within the Underlying Litigation.

CONCLUSION

The District Court incorrectly granted summary judgment to the Insurers pursuant to Rule 56 of the Federal Rules of Civil Procedure. Failure to adhere to binding Georgia caselaw merits reversal, and violation of Bloodworth's due process rights for the opportunity to argue the application of the term "occurrence," as used in the Bloodworth Policies necessitates remand. Accordingly, Bloodworth respectfully submits that this Court should reverse and remand the District Court's grant of summary judgment.

DATED: July 5, 2024.

WATSON SPENCE LLP

*/s/ CHRISTOPHER L. FOREMAN*
CHRISTOPHER L. FOREMAN
Georgia State Bar Number: 507739
TYERUS R. SKALA

47

Georgia State Bar Number: 764980
F. FAISON MIDDLETON, IV
Georgia State Bar Number: 504745
320 Residence Avenue (31701)
Post Office Box 2008
Albany, Georgia 31702-2008
(229) 436-1545 Telephone
(229) 436-6358 Facsimile
cforeman@watsonspence.com
tskala@watsonspence.com
fmiddleton@watsonspence.com

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned attorney hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Eleventh Circuit Rule 28-1. This brief contains 11,290 words and uses a Times New Roman 14-point font.

WATSON SPENCE LLP

*/s/ CHRISTOPHER L. FOREMAN*
CHRISTOPHER L. FOREMAN
Georgia State Bar Number: 507739
cforeman@watsonspence.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 5, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pros se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

WATSON SPENCE LLP

*/s/ CHRISTOPHER L. FOREMAN*
CHRISTOPHER L. FOREMAN
Georgia State Bar Number: 507739
cforeman@watsonspence.com