APPEAL NO. 24-11398-F

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

**ALLIED PROPERTY AND CASUALTY INSURANCE COMPANY**
**and AMCO INSURANCE COMPANY,**
*Plaintiffs-Appellees,*

v.

**BLOODWORTH WHOLESALE DRUGS, INC.,**
*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Middle District of Georgia, Valdosta Division
Case No.: 7:22-cv-00113-WLS

---

**BRIEF OF APPELLEES**

---

**Lee Clayton**
**Georgia Bar No. 601004**
**Lauren D. Woodrick**
**Georgia Bar No. 324394**
**Swift, Currie, McGhee & Hiers, LLP**
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309
Telephone: (404) 874-8800
Facsimile: (404) 888-6199
lee.clayton@swiftcurrie.com
lauren.woodrick@swiftcurrie.com

***Attorneys for Appellees***

## <u>CERTIFICATE OF INTERESTED PERSONS</u>
## <u>AND CORPORATE DISCLOSURE STATEMENT OF APPELLEES</u>

Appellees Allied Property and Casualty Insurance Company ("Allied") and AMCO Insurance Company ("AMCO") (collectively, "Appellees"), pursuant to 11th Cir. R. 26.1-1(a), certify that the Certificate of Interested Persons and Corporate Disclosure Statement submitted by Appellant Bloodworth Wholesale Drugs, Inc. ("Bloodworth") in its Opening Appellate Brief is correct and complete.


*/s/ Lee Clayton*
Lee Clayton

## STATEMENT REGARDING ORAL ARGUMENT

Appellees believe the District Court's Order, the parties' briefs filed in the District Court, and the parties' briefs on appeal fully address the legal issues before the Court, and oral argument is unnecessary. The issues on appeal require a straightforward application of law, comparing the terms of the subject insurance policies to the allegations in the Underlying Litigation. Numerous appellate courts have addressed this exact coverage question in the opioid litigation context, and a trend of appellate rulings consistent with the District Court's conclusion has emerged over the past several years. Given the extensive persuasive authority deciding materially identical cases, this Court has adequate guidance to decide this appeal without oral argument.

However, Appellees recognize there is no binding authority on the coverage issue presented in the opioid litigation context, and they would be pleased to present oral argument if the Court believes it would be of assistance.

## <u>TABLE OF CONTENTS</u>

**STATEMENT REGARDING ORAL ARGUMENT** ........................................... i

**TABLE OF CONTENTS** ............................................................................ ii

**TABLE OF CITATIONS** ........................................................................ iv

**STATEMENT OF THE ISSUES** ...............................................................1

**STATEMENT OF THE CASE** ...................................................................1

    **A. Relevant Facts** ............................................................................1

        **1. The Underlying Litigation** ..............................................**2**

        **2. The Policies** ........................................................................**6**

    **B. Course of Proceedings** .............................................................**12**

    **C. Standard of Review** ..................................................................**13**

**SUMMARY OF APPELLEES' ARGUMENT** .................................................**14**

**ARGUMENT AND CITATIONS TO AUTHORITY** .......................................**17**

    **A. The District Court Correctly Concluded the Opioid Lawsuit Complaints Do Not Seek "Damages Because of 'Bodily Injury'" Within the Meaning of the Policies** ..................................................................**17**

        **1. The District Court correctly analyzed relevant Georgia caselaw.17**

        **2. <u>Cesnik</u> draws more helpful parallels to this matter than <u>Lunceford</u>** .........................................................................**24**

        **3. Bloodworth fares no better relying on arguments rejected by other courts in prior opioid coverage cases or not raised below...29**

       a.  **Additional provisions of the Policies demonstrate that the claims in the Underlying Litigation are not covered………………………………………………29**

           i.  **The "Loss of Services" Provision…………………..………………29**

          ii.  **Exclusion – Designated Products Endorsement……………………………31**

       iii.  **Bloodworth fails to address policy provisions which support the Appellees'—and the District Court's—interpretation of the policy language……………………………………34**

       b.  **Bloodworth cannot rely on settlements to which neither it nor Appellees are a party………………36**

     4.  **Bloodworth presents the minority view of the coverage analysis without meaningfully addressing the growing trend of courts finding no coverage in this context…………………………………38**

 **B. Bloodworth's "Occurrence" Issue Concerns Unappealable <u>Dicta</u> and Advances Arguments Not Raised Below  …………………………………48**

     1.  **Bloodworth's "occurrence" issue concerns statements made in <u>dicta</u>…………………………………………………………………48**

     2.  **This Court should disregard Bloodworth's substantive argument as to whether the complaints in the Underlying Litigation allege an "occurrence" because those arguments were not raised or considered in the District Court………………………………50**

**CONCLUSION……………………………………………………………………51**

**CERTIFICATE OF COMPLIANCE …………………………………………53**

**CERTIFICATE OF SERVICE …………………………………………………54**

## TABLE OF CITATIONS

### Cases

Access Now, Inc. v. Southwest Airlines, Co.
  385 F.3d 1324 (11th Cir. 2004)..............................................................50

*Ace Am. Ins. Co. v. Rite Aid Corp.
  270 A.3d 239 (Del. 2022)............................................................ *passim*

Ace Am. Ins. Co. v. Wattles Co.
  930 F.3d 1240 (11th Cir. 2019)..................................................... 23-24

*Acuity v. Masters Pharm., Inc.
  169 Ohio St. 3d 387, 205 N.E.3d 460 (2022)............................... *passim*

AIU Ins. Co. v. McKesson Corp.
  No. 22-16158, 2024 WL 302182 (9th Cir. Jan. 26, 2024) ....................... 41-42, 47

AIU Insurance Co. v. McKesson Corp.
  598 F. Supp. 3d 774 (N.D. Cal. 2022)..................................... 38, 41-42

Alfred L. Snapp & Son v. Puerto Rico
  458 U.S. 592 (1982) .............................................................................27

Allstate Ins. Co. v. Grayes
  216 Ga. App. 419 (1995).....................................................................32

AmerisourceBergen Drug Corp. v. ACE Am. Ins. Co.
  2020 W. Va. Cir. LEXIS 3 (Nov. 23, 2020)............................... 38-39, 43

Amerisure Mut. Ins. Co. v. Auchter Co.
  673 F.3d 1294 (11th Cir. 2012)..................................................... 32-33

Auto-Owners Ins. Co. v. Minor
  No. 1:10-CV-03019-SCJ, 2012 WL 13005360 (N.D. Ga. Feb. 10, 2012) ..........20

Auto-Owners Ins. Co. v. State Farm Fire & Cas. Co.
  297 Ga. App. 751 (2009)......................................................................38

iv

Bartenfeld v. Chick-fil-A, Inc.
   346 Ga. App. 759 (2018) .................................................................... 20 n.4

Brayman v. Allstate Ins. Co.
   212 Ga. App. 96 (1994) ....................................................................... 28

Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty., Fla.
   48 F.4th 1222 (11th Cir. 2022) .......................................... 29 n. 6, 32, 36

Church of Scientology of Cal. v. United States
   506 U.S. 9 (1992) ................................................................................ 49

Cincinnati Ins. Co. v. H.D. Smith, LLC
   829 F.3d 771 (7th Cir. 2016) ..................................................... *passim*

Cincinnati Ins. Co. v. Richie Enterprises LLC
   Case No. 1:12-CV-00816, 2014 WL 3513211 (W.D. Ky. 2014) .................. 46-47

City of Chicago v. Beretta U.S.A., Corp.
   213 Ill. 2d 351, 821 N.E.2d 1099 (2005) ........................................... 41

Colonial Pipeline Co. v. AIG Specialty Ins. Co.
   No. 1:19-CV-762-MLB, 2022 WL 866414 (N.D. Ga. Mar. 23, 2022)............... 33

Diamond State Ins. Co. v. Chester-Jensen Co., Inc.
   243 Ill. App.3d 471, 611 N.E.2d 1083 (1993) ..................................... 41

Dunson v. Cordis Corp.
   854 F.3d 551 (9th Cir. 2017) ............................................................. 3

Evanston Ins. Co. v. Mellors
   141 F. Supp. 3d 1367 ........................................................................ 19

Evanto v. Fed. Nat'l Mortg. Assn
   814 F.3d 1295 (11th Cir. 2016). ........................................................ 31

Giant Eagle, Inc. v. Am. Guar. & Liab. Ins. Co.
   499 F. Supp. 3d 147 (W.D. Pa. 2020) ........................................... 38, 43

Giant Eagle, Inc. v. Am. Guar. & Liab. Ins. Co.
  2021 WL 6276267 (W.D. Pa. May 25, 2021) ........................................................43

In re 3M Combat Arms Earplug Prod. Liab. Litig.
  No. 3:19-MD-2885, 2022 WL 504451................................................................ 3-4

IN RE: CVS OPIOID INSURANCE LITIGATION
  No. N22C-02-045 PRW CCLD, 2024 WL 3882607, at *4 n.38 (Del. Super. Ct.
  Aug. 20, 2024) ........................................................................................... 41 n.7

In re Nat'l Prescription Opiate Litig.
  976 F.3d 664 (6th Cir. 2020)…………………………………………………...5

Kerr–McGee Corp. v. Ga. Cas. & Sur. Co.
  256 Ga. App. 458 (2002) ..................................................................................20

Longstreet v. Decker
  717 S.E.2d 513 (Ga. Ct. App. 2011) ..................................................................33

Lunceford v. Peachtree Cas. Ins. Co.
  230 Ga. App. 4 (1997) .................................................................................. passim

Macon Iron & Paper Stock Co., Inc. v. Transcontinental Ins. Co.
  93 F. Supp. 2d 1370 (M.D. Ga. 1999)................................................................32

Motorists Mut. Ins. Co. v. Quest Pharms., Inc.
  No. 5:19-CV-00187-TBR, 2021 WL 1794754 (W.D. Ky. May 5, 2021)..... 41 n.7

Nat'l Cas. Co. v. Georgia Sch. Boards Ass'n-Risk Mgmt. Fund
  818 S.E.2d 250 (Ga. 2018) ...............................................................................33

O'Dell v. St. Paul Fire & Marine Ins. Co.
  223 Ga. App. 578 (1996).......................................................................... 22-23, 28

*Pac. Employers Ins. Co. v. Cesnik
  219 F.3d 1328 (11th Cir 2000).................................................................... passim

Presidential Hotel v. Canal, Ins. Co.
  188 Ga. App. 609 (1988)......................................................................... 22, 23, 28

Santo's Italian Cafe LLC v. Acuity Ins. Co.
   15 F.4th 398 (6th Cir. 2021)................................................................33

Sapuppo v. Allstate Floridian Ins. Co.
   739 F.3d 678 (11th Cir. 2014).............................................................44

Scott v. United States
   890 F.3d 1239 (11th Cir. 2018)..................................................... 25 n.5

Teel v. Lozada
   99 F.4th 1273 (11th Cir. 2024)............................................................21

Travelers Prop. Case. Co. of Am. v. Anda, Inc.
   658 F. App'x 955 (11th Cir. 2016)................................................ 46-47

Travelers Prop. Cas. Co. of Am. v. Anda, Inc.
   90 F. Supp. 3d 1308 (S.D. Fla. 2015)........................................... 45-46

United States v. $242,484.00
   389 F.3d 1149 (11th Cir. 2004)...........................................................49

Walmart, Inc. v. ACE American Ins. Co., et al.
   Case No. 04CV22-2835-4 (Ark. Cir. Ct. December 29, 2023)..................... 38, 43

Walter Int'l Prods., Inc. v. Salinas
   650 F.3d 1402 (11th Cir. 2011)...........................................................49

*Westfield Nat'l Ins. Co. v. Quest Pharms., Inc.
   57 F.4th 558 (6th Cir. 2023)..................................................... passim

Westfield Nat'l Ins. Co. v. Quest Pharms., Inc.
   No. 5:19-CV-00083-TBR, 2021 WL 1821702 (W.D. Ky. May 6, 2021)..... 41 n.7

## Statutes

O.C.G.A. § 10-13B-1 .................................................................36

**Secondary Sources**

57B Am. Jur. 2d Negligence § 954 (2023 ed.) ................................................. 39-40

Windt, § 6:31, Determining whether grounds for settlement were outside policy coverage, 2 Insurance Claims and Disputes § 6:31 (6th ed.) ..............................37

## STATEMENT OF THE ISSUES[1]

1. Summary judgment was properly granted in favor of Appellees because the government and healthcare plaintiffs in the Underlying Litigation do not seek "damages because of 'bodily injury'" within the meaning of the subject insurance policies.

2. The District Court did not grant summary judgment on the issue of whether the Underlying Litigation alleges an "occurrence" within the meaning of the subject insurance policies, and this Court should not consider Bloodworth's arguments based on the false premise that this was ruled upon by the District Court. Similarly, this Court should not consider substantive arguments regarding whether the Underlying Litigation alleges an "occurrence" raised for the first time on appeal.

## STATEMENT OF THE CASE

### A.    Relevant Facts

Bloodworth's Statement of Facts contains some assertions with which Appellees agree, but its statement also misconstrues and omits certain important information. It also presents certain information that was not before the District Court. Thus, Appellees offer the following discussion of the facts.

---

[1] Appellees agree with and adopt Bloodworth's jurisdictional statement. (Appellant's Brief at 1).

### 1.    The Underlying Litigation

Bloodworth is a defendant in twenty-six (26) Opioid Lawsuits (hereinafter "the Underlying Litigation").  ([Doc. 28] at ¶ 18; [Doc. 14] at ¶ 26).  County and municipal governmental entities filed twenty-four (24) of the lawsuits at issue, while the remaining two (2) lawsuits were filed by hospital organizations and medical management companies.  ([Doc. 28] at ¶ 18; [Doc. 14] at ¶¶ 26, 134, 139).  All of the plaintiffs in the Underlying Litigation are city or county governments, individuals in their capacities as government officials, or healthcare providers.  (See [Doc. 28] at ¶ 18).

While not identical, the Complaints in the Underlying Litigation are all similar.[2]  (See [Doc. 14] at ¶ 27). The Complaints each name Bloodworth as a pharmaceutical distributor and allege such distributors failed to monitor for, investigate, report, and stop suspicious orders of opioid medications, which, according to the Complaints, contributed to the opioid crisis.  (Id.).  Seventeen (17) of the twenty-six (26) Complaints specifically state the plaintiffs do not seek damages for personal injury or property damage.  (Id. at ¶¶ 28, 32, 37, 43, 85, 96, 104, 118, 126; [Doc. 14-3] at ¶¶ 330, 482, 492; [Doc. 14-5] at ¶ 76 ; [Doc. 14-14] at

---

[2] The Complaints raising identical counts and factual allegations were grouped together in Appellees' Amended Complaint.  (See, e.g., [Doc. 14] at ¶¶ 28, 37, 46, 54, 61).

¶ 426; [Doc. 14-16] at ¶ 925; [Doc. 14-18] at ¶ 680; [Doc. 14-21] at ¶ 254; [Doc. 14-23] at ¶ 39).  While the other nine (9) Complaints do not explicitly disavow certain categories of damages, those Complaints still describe the plaintiffs' damages as "economic losses," "economic harms," or "economic costs."  (Id. at ¶¶ 46, 50, 54, 58, 61, 64, 70, 76, 110; [Doc. 14-7] at ¶¶ 1, 10, 253, 254, 255, 258, 320, 331, 490, 504, 515; [Doc. 14-9] at ¶¶ 1, 9, 233, 234, 235, 236, 456; [Doc. 14-11] at ¶ 30; [Doc. 14-12] at ¶¶ 4, 32, 852, 891, 904, 909; [Doc. 14-13] at ¶¶ 22, 314, 392, p. 2; [Doc. 14-20] at ¶¶ 1, 7, 150, 176, 193, 199, 256).  None of the Complaints raise claims for medical monitoring.  (See, e.g., [Doc. 14-6], [Doc. 14-7], [Doc. 14-15]).

As set forth in paragraph 26 of Plaintiffs' Amended Complaint, the majority of the underlying lawsuits against Bloodworth were filed by Georgia governmental entities, in Georgia federal and state courts or in the multi-district litigation ("MDL") in the Northern District of Ohio before Judge Dan Polster.  All cases have been transferred to the MDL.

To make the MDL more manageable, bellwether cases were selected that were representative of many lawsuits.  While the bellwether cases are not expressly binding on other cases in the MDL, they demonstrate the strengths and weaknesses of the claims raised in comparable matters. See Dunson v. Cordis Corp., 854 F.3d 551, 555 (9th Cir. 2017); see also In re 3M Combat Arms Earplug Prod. Liab. Litig.,

No. 3:19-MD-2885, 2022 WL 504451, at *3 (N.D. Fla. Feb. 18, 2022), objections overruled, No. 3:19MD2885, 2022 WL 2436843 (N.D. Fla. Mar. 11, 2022); (In re Nat'l Prescription Opiate Litig., No. 1:17-MD-2804 ("MDL"), [Doc. 2399] at 2). Thus, the bellwether cases provide roadmaps for the lawsuits against Bloodworth. In the MDL, lawsuits brought by Cuyahoga County, Ohio, and Summit County, Ohio, have been the lead bellwether cases for distributor defendants. (MDL, [Doc. 3116]). Judicial rulings and reasoning related to the bellwether cases, as well as the plaintiffs' admissions in those cases, provide insight into the relief sought in the Underlying Litigation.

For example, the bellwether plaintiffs expressly state they are suing for their own "economic damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections, rehabilitation, and other services." (MDL, [Doc. 3020], Summit County Third Amended Complaint at ¶ 1025). They claim the economic losses are "not part of the normal and expected costs of a local government's existence," they have "incurred expenditures for special programs over and above [their] ordinary public services," and each is "asserting its own rights and interests and Plaintiff's claims are not based upon or derivative of the rights of others." (MDL, [Doc. 3021], Cuyahoga County Third Amended Complaint at ¶¶ 1067, 1071, 1072, 1075; MDL, [Doc. 3020], Summit County Third Amended Complaint at ¶¶ 1025, 1029, 1030, 1033). Importantly, they

state they are <u>not</u> seeking "damages for death, physical injury to person [or] emotional distress." (MDL [Doc. 3021], Cuyahoga County Third Amended Complaint at ¶ 1088; MDL [Doc. 3020], Summit County Third Amended Complaint at ¶ 1038).

> In a mandamus proceeding related to the MDL, Judge Polster pointed out:

> [t]he [counties] have consistently stated, and I have likewise repeatedly concluded, that the city and county Plaintiffs do not seek recovery based on injuries to individual residents; rather the Plaintiffs seek recovery <u>for direct injuries suffered by the Plaintiffs themselves</u>. . . . That the relief sought by the Plaintiff cities and counties for their own injuries, if granted, will also tend to collaterally benefit their residents, does not mean that Plaintiffs seek to litigate on behalf of those residents.

(Ohio MDL Mandamus Action, <u>In re: State of Ohio</u>, 6th Cir., No. 19-3827, [Doc. 23] at 2 (citations omitted) (emphasis in original)).

Similarly, a judge of the Sixth Circuit Court of Appeals, examining whether the MDL court could certify a "negotiation class," explained that the city and county plaintiffs are not asserting *parens patriae* claims and, instead, "seek damages for the direct harm that they allegedly sustained." <u>In re Nat'l Prescription Opiate Litig.</u>, 976 F.3d 664, 707 (6th Cir. 2020) (Moore, J., dissenting as to the majority's decertification of a negotiation class). Judge Moore explained that the cities and counties have suffered a "depletion of their coffers" and it is "perfectly within the prerogative of counties and cities to try to recoup these enormous expenditures." <u>Id</u>. at 707-08.

- 5 -

Additionally, Judge Polster concluded the bellwether plaintiffs' public nuisance claims seek abatement of the nuisance, which is an equitable remedy and not "damages." (MDL, [Doc. 2519], at 2). He reasoned, "[t]he goal is not to compensate the harmed party for harms already caused by the nuisance. This would be an award of damages. Instead, an abatement remedy is intended to compensate the plaintiff for the costs of rectifying the nuisance going forward." (Id.) (See also MDL, [Doc. 2572] at 5 (noting plaintiffs do not seek compensatory damages in nuisance claim)).

The allegations of the MDL bellwether plaintiffs, and the accompanying district court and Sixth Circuit findings, rulings, and rationales, make sense because these limitations on the plaintiffs' claims avoid significant legal hurdles. If local governments or healthcare providers were to seek bodily injury damages from opioid manufacturers and distributors, they would face the challenges of proving standing and causation, overcoming damage caps, and combating arguments regarding comparative fault and preemption, among other issues. The plaintiffs in the Underlying Litigation avoid these issues by seeking damages solely for their own economic costs incurred due to the opioid epidemic.

## 2. The Policies

Allied issued to Bloodworth Policy Numbers ACP GLPO 7102204036, ACP GLPO 7112204036, ACP GLPO 7122204036, ACP GLPO 7132204036, ACP

- 6 -

GLPO 7142204036, ACP GLPO 7152204036, ACP GLPO 7162204036, ACP GLPO 7172204036, ACP GLPO 7182204036, and ACP GLPO 7192204036 for consecutive one-year periods from May 31, 2006 to May 31, 2018 (the "CGL Policies"). Each of the CGL Policies is written on the Insurance Service Office's CG0001 Commercial General Liability Coverage Form. ([Doc. 32-2] at ¶¶ 3, 7, 8 & pp. 7-128; [Doc. 28] at ¶ 6).

Coverage A of the CG0001 Commercial General Liability Coverage Form states:

### SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** *We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply. We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result…*

**b.** *This insurance applies to 'bodily injury' and 'property damage' only if:*

*(1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory';*

- 7 -

**(2)** *The 'bodily injury' or 'property damage occurs during the policy period; and*

**(3)** *Prior to the policy period, no insured listed under Paragraph 1. of Section II—Who is An Insured and no 'employee' authorized by you to give or receive notice of an 'occurrence' or claim, knew that the 'bodily injury' or 'property damage' occurred, in whole or in part. If such a listed insured or authorized 'employee' knew, prior to the policy period, that the 'bodily injury' or 'property damage' occurred, then any continuation, change or resumption of such 'bodily injury' or 'property damage' during or after the policy period will be deemed to have been known prior to the policy period.*

([Doc. 32-2] at 28).   Coverage B of the CG0001 Commercial General Liability

Coverage Form states:

### COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

*We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'personal and advertising injury' to which this insurance does not apply. . . .*

(Id. at 33).

In the CG0001 Commercial General Liability Coverage Form, "bodily injury"

is defined as "*bodily injury, sickness or disease sustained by a person, including*

- 8 -

*death resulting from any of these at any time*." (Id. at 40).  The Form defines

"personal and advertising injury" as:

> *injury, including consequential 'bodily injury' arising out of one or more of the following offenses:*
> a.  *False arrest, detention or imprisonment;*
> b.  *Malicious prosecution;*
> c.  *The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;*
> d.  *Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;*
> e.  *Oral or written publication, in any manner, of material that violates a person's right of privacy;*
> f.  *The use of another's advertising idea in your 'advertisement;' or*
> g.  *Infringing upon another's copyright, trade dress or slogan in your 'advertisement.'*

(Id. at 42).  And "property damage" means:

> a.  *Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or*
>
> b.  *Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it.*
>
> *For the purposes of this insurance, electronic data is not tangible property.*

(Id.).

The CGL Policies also provide that "bodily injury" or "property damage" are

considered known when an insured or its authorized employee:

(1) *Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;*

(2) *Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or*

(3) *Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.*

(Id. at 28).  Further, "*[d]amages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from the 'bodily injury'.*"  (Id.).

The CGL Policies also contain a number of conditions precedent to coverage. For example, in the event of an occurrence, offense, claim or suit, the insured must notify the insurer of the occurrence, and the notice should include: "*[h]ow, when and where the 'occurrence' or offense took place*"; "*[t]he names and addresses of any injured persons and witnesses*"; and "*[t]he nature and location of any injury or damage arising out of the 'occurrence' or offense.*"  (Id. at 38).

AMCO issued to Bloodworth Policy Numbers ACP CAA 7102204036, ACP CAA 7112204036, ACP CAA 7122204036, ACP CAA 7132204036, ACP CAA 7142204036, ACP CAA 7152204036, ACP CAA 7162204036, ACP CAA 7172204036, ACP CAA 7182204036, and ACP CAA 7192204036 for consecutive one-year periods from May 31, 2006 to May 31, 2018 (the "Umbrella Policies") (collectively, the "CGL Policies" and the "Umbrella Policies" will be referred to as

"the Policies"). ([Doc. 32-2] at ¶ 9).  Each of the Umbrella Policies is written on the

Insurance Service Office's UMB002 Form.  (Id. at ¶¶ 11, 12; [Doc. 28] at ¶ 15.)  The

Insuring Agreement for Coverage A of the UMB002 Form states:

### Coverage A – Excess Follow Form Liability Insurance

**1.**   *Under Coverage A, we will pay on behalf of the 'insured' that part of 'loss' covered by this insurance in excess of the total applicable limits of 'underlying insurance,' provided the injury or offense takes place during the Policy Period of this policy.   The terms and conditions of 'underlying insurance' are, with respect to Coverage A, made a part of this policy except with respect to:*

   a.  *Any contrary provision contained in this policy; or*

   b.  *Any provision in this policy for which a similar provision is not contained in 'underlying insurance'.*

([Doc. 32-2] at 138).  The Insuring Agreement for Coverage B of the UMB002 Form

states:

### Coverage B – Umbrella Liability Insurance

*Under Coverage B, we will pay on behalf of the 'insured' damages the 'insured comes legally obligated to pay by reason of liability imposed by law . . . because of 'bodily injury,' 'property damages, or 'personal and advertising injury' covered by this insurance that takes place during the Policy Period and is caused by an 'occurrence.'  We will pay such damages in excess of the retained limit aggregate specified in . . . the Declarations or the amount payable by 'other insurance,' whichever is greater.*
(Id.).

**B.    Course of Proceedings**

Appellees agree with the course of proceedings stated in Bloodworth's brief (Appellant's Brief at 3-5), but they disagree with its characterization of the District Court's findings and conclusions, which are inconsistent with the District Court's Order.  E.g., compare (Appellant's Brief at 4-5) and ([Doc. 45] at 13, 15-17).

In particular, Appellees disagree with Bloodworth's assertion the District Court "held that the complaints in the Underlying Litigation did not allege an 'occurrence.'"  (Appellant's Brief at 4-5).  The District Court's Order specifically states the Court analyzed how the definition of "occurrence" impacted its interpretation of the phrase "because of 'bodily injury'" in the Policies, as that section of the Order is entitled, "Viewing the Policies' 'Because of Bodily Injury' Together with 'Occurrence'".  ([Doc. 45] at 13) (emphasis added). The Court "assess[ed] the provision 'because of 'bodily injury'' in light of the term occurrence," and did not make an independent determination regarding the meaning of "occurrence" in the opioid litigation context.  (Id. at 16).  The District Court's ruling reads as follows:

> Accordingly, the Court finds that there is no genuine dispute of material fact as to whether the provision "because of 'bodily injury'" provides coverage for nonphysical damages, such as economic losses, sought by healthcare providers and governmental entities for having provided various treatments, services, and programs to combat and abate the opioid epidemic in the underlying opioid lawsuits. To be clear, the Court, by this Order, finds only that economic damages, that are not connected to a specific individual who suffered physical bodily injury,

are not covered by the Policies at issue in the above-styled matter. Therefore, Plaintiffs Allied and AMCO's Motion for Summary Judgment (Doc. 32) is GRANTED and Defendant Bloodworth's Motion for Summary Judgment (Doc. 31) is DENIED.

(Id. at 17) (emphasis added).

## C.    Standard of Review

Appellees agree with the standard of review stated by Bloodworth with respect to a grant of summary judgment. (See Appellant's Brief at 12 (District Court's grant of summary judgment reviewed *de novo*)).  While Appellees agree an abuse-of-discretion standard can be applied to constitutional violations, (Id. at 12 n.1) for the reasons explained in Section B of its argument, Appellees dispute that any constitutional violation occurred, as Bloodworth misreads the District Court's Order.

## SUMMARY OF APPELLEES' ARGUMENT

In this declaratory judgment action, the District Court determined whether Appellees have any obligations or duties under the Policies and whether coverage is afforded to Bloodworth in connection with the Underlying Litigation, which alleges Bloodworth's conduct caused or contributed to the current opioid crisis. In its Order on the parties' respective Summary Judgment Motions, the District Court followed Georgia law, the majority view in persuasive authority, and the provisions of the Policies when it concluded the complaints in the Underlying Litigation did not seek "damages because of 'bodily injury'" within the meaning of the Policies.

Specifically, the District Court correctly concluded Georgia law requires an actual claim "on account of" bodily injury, and the phrase "bodily injury" is limited to physical injury and does not extend to all forms of "personal injury." Because the plaintiffs in the Underlying Litigation do not raise claims to recover for physical injury, but instead seek to recover their costs for government services and healthcare administration due to the opioid epidemic, their claims do not seek "damages because of 'bodily injury.'"

The District Court's conclusion that the phrase "damages because of 'bodily injury'" refers to a particular injury and requires more than a tenuous connection to physical harm is not only consistent with Georgia law, but also follows the majority of courts nationally that have examined this coverage issue. Six appellate courts

have examined coverage issues in the context of the nationwide opioid litigation. Five of those courts have determined CGL policies do not provide coverage for economic-loss lawsuits, with three of those appellate decisions based on the same issue before this Court in this appeal.

Bloodworth seeks to avoid this result by overstating the holdings and importance of certain Georgia appellate decisions, cherry-picking policy language, raising new arguments on appeal, and ignoring adverse persuasive authority. But these flawed arguments do not demonstrate the District Court's analysis of the phrase "damages because of 'bodily injury'" was in error.

Bloodworth also misreads the District Court's Order with respect to a separate coverage issue—whether the complaints in the Underlying Litigation allege an "occurrence" within the meaning of the Policies. The District Court only discussed this issue in passing and did not make a ruling on it, as the parties did not brief it. Because Bloodworth misconstrues the Court's extraneous statements about "occurrence" as a ruling on that issue, it seeks reversal of the District Court's "finding" as to "occurrence" and contends its rights under the Due Process Clause were violated. However, the "finding" on "occurrence" with which Bloodworth takes issue was actually dicta, not a ruling. As such, it cannot be appealed. Likewise, because the parties did not brief their substantive arguments regarding the meaning

of "occurrence" in the District Court,[3] Bloodworth's substantive arguments on that issue—raised for the first time on appeal—must be disregarded.

Accordingly, the District Court's Order, which <u>only</u> concluded the Underlying Litigation did not seek "damages because of 'bodily injury,'" must be affirmed.

---

[3] Indeed, the District Court's Order acknowledged the bifurcated nature of the briefing and noted the Summary Judgment Motions upon which it was ruling were limited to the issue of whether the Underlying Litigation seeks "damages because of 'bodily injury.'" ([Doc. 45] at 4 n.2).

## ARGUMENT AND CITATIONS TO AUTHORITY

**A.    The District Court Correctly Concluded the Opioid Lawsuit Complaints Do Not Seek "Damages Because of 'Bodily Injury'" Within the Meaning of the Policies.**

Following the majority view developed over the past decade, the District Court correctly applied Georgia law and this Court's precedent to conclude the allegations against Bloodworth in the Underlying Litigation do not fall within the Policies' insuring agreements because the plaintiffs in the Underlying Litigation seek purely economic damages, which are not "damages because of 'bodily injury.'" Bloodworth concedes the plaintiffs in the Underlying Litigation "artful[ly] . . . pleaded" their claims "to circumvent certain statutes of limitation," (Appellant's Brief at 15), but it nonetheless argues this Court should ignore those deliberate pleading choices. As discussed below, Bloodworth's arguments do not demonstrate error, much less reversible error, by the District Court in its coverage analysis.

### 1.    The District Court correctly analyzed relevant Georgia caselaw.

Bloodworth criticizes the District Court's analysis of Georgia law for myriad reasons. However, as discussed below, none of those reasons are convincing. In fact, Bloodworth's criticisms only demonstrate its own misunderstanding of the law regarding the phrase "damages because of 'bodily injury'" and coverage analysis generally, as it places undue importance on one Georgia Court of Appeals decision

and misstates the holdings of several others.

Bloodworth's argument is primarily based on its overly broad reading of the Georgia Court of Appeals' decision in <u>Lunceford v. Peachtree Cas. Ins. Co.</u>, 230 Ga. App. 4 (1997). It asserts that the District Court contravened the holding in <u>Lunceford</u> by concluding the phrase "damages because of 'bodily injury'" is unambiguous in the context of opioid litigation. (Appellant's Brief at 16-19). Specifically, Bloodworth contends the <u>Lunceford</u> court "[u]nequivocally . . . held the term . . . 'because of bodily injury' can . . . be ambiguous," and that determination is not limited to the insurance policy at issue in <u>Lunceford</u>. (<u>Id</u>. at 18). According to Bloodworth, the District Court did not "abide by binding Georgia law" when it concluded the phrase "because of 'bodily injury'" is unambiguous in the current context. (<u>Id</u>. at 18-19). However, Bloodworth overstates the holding of <u>Lunceford</u> and its impact on this case, while ignoring the District Court's careful consideration of the decision.

Although the holding in <u>Lunceford</u> was not limited to a single policy, it <u>was</u> limited to the context in which the Georgia Court of Appeals examined the policy language. The <u>Lunceford</u> court held, "[t]he policy language . . . is ambiguous <u>with respect to punitive damages</u> and . . . must be construed against [the insurer]." 230 Ga. App. at 8 (emphasis added). <u>Lunceford</u> did not address the issue in this case: whether the phrase "because of 'bodily injury'" applies to claims for purely

economic losses not connected to a particular physical injury.  Rather, it addressed whether the phrase applies to punitive damages derivative of a personal injury claim arising out of a specific physical harm to an individual caused by an auto accident. Id. at 7.  Additionally, the case Bloodworth cites with approval for its adherence to Lunceford raised a coverage question regarding punitive damage, and, thus, examined the policy language in the same context as Lunceford.  (Appellant's Brief at 18, citing Evanston Ins. Co. v. Mellors, 141 F. Supp. 3d 1367, 1379).

Throughout its brief, Bloodworth overinflates the importance of Lunceford, describing it as "binding, enforceable law" from which the District Court could not depart.  (Appellant's Brief at 23).  However, the differences between the issues in Lunceford and the issues presented here only further demonstrate why coverage is not afforded for the Underlying Litigation.  Lunceford concerned a claim for punitive damages in the context of a car wreck, where the plaintiff had suffered, and was claiming recovery for, a specific bodily injury.  230 Ga. App. at 4-5.  Here, the plaintiffs in the Underlying Litigation seek purely economic losses not connected to any person in particular.

The Lunceford court considered the broadest reasonable interpretation of the phrase "damages because of 'bodily injury'" to be "damages for which the insured is legally liable because a claimant was injured . . . ."  230 Ga. App. at 7 (emphasis added).  Thus, Lunceford considered the meaning of this phrase only in the context

- 19 -

of a particular, identifiable injury.[4]  Because the connection to a specific physical harm was clear in <u>Lunceford</u>, the court did not need to address the core issue here—whether claims can fall within the insuring agreement absent a connection to <u>any</u> particular physical injury.

As the District Court noted, and courts applying Georgia law have recognized, although insurance policy language "might be ambiguous in one coverage context, it could [be] clear when applied to another."  <u>Auto-Owners Ins. Co. v. Minor</u>, No. 1:10-CV-03019-SCJ, 2012 WL 13005360, at *10 (N.D. Ga. Feb. 10, 2012) (citing <u>Kerr–McGee Corp. v. Ga. Cas. & Sur. Co.</u>, 256 Ga. App. 458, 462–63 (2002)).  The District Court considered <u>Lunceford</u> in its Order, but it concluded that, in the context of pure economic-loss claims made in opioid litigation, the policy language was unambiguous.  ([Doc. 45] at 10).  Because <u>Lunceford</u> did not answer the question before the Court in this case, the District Court was not required to apply its ambiguity determination in this case.

Even if <u>Lunceford</u> was "binding, enforceable law" the District Court was required to follow (and, as explained above, it is not), the Court's failure to do so would still not be reversible error.   Namely, if the District Court had concluded the

---

[4] While the punitive damages claim at issue in <u>Lunceford</u> was not an independent claim for damages based on monetary compensation for bodily injury, it is well-settled Georgia law that a punitive damages claim cannot succeed unless the underlying cause of action succeeds.  <u>Bartenfeld v. Chick-fil-A, Inc.</u>, 346 Ga. App. 759, 769 (2018).  As such, a claim for punitive damages in a personal injury case would still require proof of a specific injury.

phrase was ambiguous and, therefore, must be construed broadly, a broad construction of the policy language would not have changed the Court's ultimate coverage determination.    In Pac. Employers Ins. Co. v. Cesnik, 219 F.3d 1328 (11th Cir 2000), this Court cited Lunceford while examining whether certain contract-based claims sought "damages because of 'bodily injury'" within the meaning of a CGL policy.    The Cesnik Court held the phrase "because of"—even when construed expansively—still "require[s] a connection between the damages sought and a covered bodily injury." Id. at 1331-32.

Here, the District Court cited Cesnik and concluded, "regardless of which interpretation of the provision is used . . . the provision . . . requires a connection to a particular, alleged physical, bodily injury of a person(s)." ([Doc. 45] at 11).    Thus, the District Court examined the policy language even under the broadest construction of the phrase and still determined the Underlying Litigation did not fall within the terms of the Policies' insuring agreements.    Because the District Court followed Cesnik and examined the provision under its broadest interpretation, any purported "error" in "failing to abide" by Lunceford's ambiguity holding was not reversible error.    Teel v. Lozada, 99 F.4th 1273, 1280 (11th Cir. 2024) (stating this Court "may affirm the judgment below on any ground supported by the record, regardless of whether it was relied on by the district court") (citation omitted).

Bloodworth essentially argues the District Court should have followed

Lunceford to the exclusion of all other Georgia cases, as it appears to criticize the Court's citation to any other Georgia appellate decision for one reason or another. However, its attempts to discredit those decisions lack merit.

First, Bloodworth appears to argue the District Court erred by relying on Presidential Hotel v. Canal, Ins. Co., 188 Ga. App. 609 (1988) because it predated Lunceford.   (Appellant's Brief at 17).   Contrary to Bloodworth's suggestion, Presidential Hotel was not overturned by Lunceford, as the case did not consider whether punitive damages fell within the meaning of the insuring agreement.  See generally Presidential Hotel, 188 Ga. App. at 609-11.  Moreover, Presidential Hotel is relevant to the District Court's coverage analysis and supports the Court's conclusion the phrase "because of 'bodily injury'" requires a connection to an actual physical injury.  The underlying plaintiffs in Presidential Hotel raised claims of "sexual harassment, fraud, and implied contract claims," for which they sought "monetary and 'mental damages.'" Id. at 611.  The Presidential Hotel court held the underlying plaintiffs did "not seek damages for actual physical harm." Id.

Second, Bloodworth contends the District Court's reliance on O'Dell v. St. Paul Fire & Marine Ins. Co., 223 Ga. App. 578 (1996) is misplaced because the underlying plaintiff in O'Dell sought redress for an "exclusively 'emotional injury,'" which is not a tort claim recognized in Georgia. (Appellant's Brief at 17).  However, the lawsuit at issue in O'Dell raised claims of assault, battery, intentional infliction

of emotional distress, sexual harassment, and negligent retention.  O'Dell, 223 Ga. App. at 578.  The Georgia Court of Appeals concluded it was not enough that the plaintiff had alleged emotional distress because she did not also allege physical harm or physical injury.  Id. at 579-80.  The O'Dell court's conclusion was not related to whether the plaintiff's claim was groundless under Georgia law.  See generally id. Ultimately, both Presidential Hotel and O'Dell support the District Court's conclusion that Georgia law requires a claim for actual physical harm—and not a claim under the more general term of "personal injury"—to fall within a CGL policy's definition of "bodily injury."  Bloodworth has cited no cases to contradict this conclusion.

Finally, Bloodworth claims the District Court misapplied Georgia law and prejudiced it by heightening the standard for finding ambiguity in insurance policy language.  (Appellant's Brief at 19-20).  Bloodworth contends that, under Georgia law, a term is ambiguous if multiple constructions are possible, and the District Court erred by requiring a showing that two or more constructions are "fairly understood."  (Id.).  This alleged "error" holds no water.

As an initial matter, the District Court did not craft the standard it used for determining ambiguity but instead cited a decision of this Court.  See Ace Am. Ins. Co. v. Wattles Co., 930 F.3d 1240, 1254 (11th Cir. 2019).  The Court was not required to cite Lunceford or any other Georgia appellate decision to establish the

standard by which it would examine the ambiguity of the policy language. Furthermore, the language cited in <u>Wattles</u>, which requires multiple "fairly understood" and "reasonable" interpretations of the policy language, creates no higher a standard for ambiguity than the language upon which Bloodworth relies, which requires multiple "reasonable" and "logical" interpretations. <u>Compare</u> <u>Wattles</u>, 903 F.3d at 1254 <u>with</u> <u>Lunceford</u>, 230 Ga. App. at 7. Moreover, as discussed above, even if the District Court had concluded the phrase "because of 'bodily injury'" was "susceptible" to a broader interpretation, the Court reached its coverage conclusion assuming the broadest interpretation of the phrase applied. As such, this alleged "error" in the District Court's application of Georgia law does not warrant reversal.

The District Court's Order correctly cited and interpreted relevant Georgia and Eleventh Circuit caselaw, which requires a connection to an actual physical injury to fall within the insuring agreement language at issue. It appears Bloodworth believes the Court should have relied solely on <u>Lunceford</u>, to the exclusion of all other cases. The District Court's refusal to accept Bloodworth's tunnel vision yielded the right result, and that result should be affirmed.

**2. <u>Cesnik</u> draws more helpful parallels to this matter than <u>Lunceford</u>.**

Continuing its campaign to elevate the importance of <u>Lunceford</u> to the coverage issue at hand, Bloodworth argues the District Court erred in relying on this

Court's decision in Cesnik—a decision that is binding precedent on the District Court[5]—in its coverage analysis. (Appellant's Brief at 20-23). Bloodworth primarily argues Cesnik is not valuable precedent because it is factually distinguishable. However, the parallels between Cesnik and this case help put the subject coverage question into perspective.

Cesnik demonstrates economic-loss claims with only a tangential connection to physical harm do not seek "damages because of 'bodily injury'" within the meaning of a CGL policy, as this Court held, "the mere fact that bodily injury occurred is insufficient to trigger coverage." 219 F.3d at 1331 (applying Georgia law). In Cesnik, adoptive parents sought recovery from an adoption agency for damages. Id. at 1329. The Cesniks' tort claims were time-barred, and they proceeded against the adoption agency on contract claims. Id. This Court concluded, "[w]hile in the body of their complaint, the Cesniks allege that 'related to the contractual agreement for the physical placement of the prospective adoption' of the boys, they incurred costs for care of the boys due to bodily injury, there is no actual claim for the damages on account of this injury." Id. at 1332. This Court held, "[l]iability, if any, for these damages would result from a breach of contract; they are not damages that the insured could be liable for by reason of or on account of

---

[5] Under the prior precedent rule, Cesnik is also binding on this Court. Scott v. United States, 890 F.3d 1239, 1257 (11th Cir. 2018).

bodily injury, and therefore, do not fall within the scope of the policy." Id.   While the Cesnik Court recognized the phrase "because of 'bodily injury'" could be construed to mean "by reason of" or "on account of" bodily injury, it concluded the insurance policy "require[d] a connection between the damages sought and a covered bodily injury." Id.  Accordingly, there must be a causal connection between the covered cause of the loss and the nature of the damages sought by the claimant.

Under Cesnik, then, even the broadest interpretation of "damages 'because of bodily injury'" under Georgia law requires damages on account of a particular physical injury.  Id.  Any tenuous connection to bodily injury will not do, and a tenuous connection is all that is present in the Underlying Litigation.   The Complaints seek no redress for any particular bodily injury, but instead seek equitable relief and damages because of economic losses resulting from the provision of government or healthcare services.  This is undeniable in seventeen (17) of the twenty-six (26) complaints, in which the plaintiffs explicitly disclaim damages because of bodily injury. Even where the plaintiffs do not take the step of disclaiming whole categories of damages, the Complaints repeatedly state the damages sought are for various increased costs of programs and lost revenue due to the opioid epidemic. Indeed, all of the Complaints in the Underlying Litigation make clear the types of damages they are requesting and list the same types of economic losses.

- 26 -

None of the Complaints identify particular injuries or injured persons for which the plaintiffs seek redress.

This case is analogous to Cesnik because the plaintiffs in Cesnik—like the plaintiffs in the Underlying Litigation—could not pursue claims directly for bodily injury. In Cesnik, the personal injury claims were barred by the statute of limitations. Id. at 1329. This Court concluded the Cesniks' attempt to recover through contract theories did not trigger coverage under the liability policies. Id. at 1332. Here, the plaintiffs lack the authority to sue on behalf of their citizens or patients for their personal injuries because only States have *parens patriae* authority to do so. Alfred L. Snapp & Son v. Puerto Rico, 458 U.S. 592, 600-03 (1982). Beyond the *parens patriae* issue, the plaintiffs in the Underlying Litigation have strategically chosen to sidestep numerous legal hurdles, including standing, causation, and preemption, by seeking a narrower form of relief based on their own economic losses. Bloodworth acknowledges this strategic pleading in its brief. (Appellant's Brief at 15, 29). Just as the Cesniks did not trigger coverage under the liability policies through their attempt to recover under contract theories, the plaintiffs' claims in the Underlying Litigation to recover for their own costs—and not for a particular bodily injury—does not trigger coverage under the Policies. Cesnik, 219 F.3d at 1332.

Bloodworth tries to minimize the significance of Cesnik, arguing it is distinguishable because the Cesniks' remaining claims sounded in contract instead

of tort, and because most claims deemed under Georgia law to be solely economic in nature are contract claims.  (Appellant's Brief at 20-22).  Bloodworth's attempted distinction between contract and tort claims fails for two key reasons.

First, Georgia courts have concluded on several occasions that tort and other non-contract claims fell outside an insuring agreement because the claims did not allege a "bodily injury."  See O'Dell, 223 Ga. App. at 578 (assault, battery, intentional infliction of emotional distress, sexual harassment, and negligent retention);  Brayman v. Allstate Ins. Co., 212 Ga. App. 96, 96 (1994) (slander); Presidential Hotel, 188 Ga. App. at 611 (sexual harassment).  Second, Georgia courts have held "bodily injury" is limited "physical injury" and not the broader term "personal injury."  Presidential Hotel, 188 Ga. App. at 611.  There would be no limitation on "personal injury" claims if any tort claim fell within the terms of the insuring agreement.  Thus, Georgia law is clear that lawsuits do not seek "damages because of 'bodily injury'" for any tort claim downstream of a bodily injury.  Here, the tort claims against Bloodworth do not even fall under the broader umbrella of "personal injury."  Instead, they are carefully chosen claims to recoup the societal costs of the opioid epidemic, and they are too far downstream of any particular physical injury to fall within the Policies' insuring agreements.

Despite Bloodworth's attempts to argue otherwise, <u>Cesnik</u> provides an apt comparison to this case. The District Court correctly examined this precedent in its Order, and that Order must be affirmed.

### 3.   Bloodworth fares no better relying on arguments rejected by other courts in prior opioid coverage cases or not raised below.

Undoubtedly realizing its entire argument under Georgia law hinges on an overly broad reading of <u>Lunceford</u>, Bloodworth pivots to a series of arguments that have either been rejected by other courts considering materially identical issues or that were not raised in the District Court. (Appellant's Brief at 25-31). To the extent any of these arguments are even properly before this Court,[6] they do not demonstrate coverage is owed under the Policies.

### a.   Additional provisions of the Policies demonstrate that the claims in the Underlying Litigation are not covered.

### i.   The "Loss of Services" Provision

First, Bloodworth contends coverage is owed under the Policies because the Underlying Litigation seeks "damages claimed by any . . . organization for care, loss of services, or death . . . ." (Appellant's Brief at 25). While Bloodworth faults the District Court for not addressing this argument, three other appellate courts which have examined the "loss of services" provision have rejected practically identical

---

[6] As discussed in the Sections A(3)(a)(ii) & A(3)(b) below, Bloodworth's arguments regarding a "potential" exclusionary endorsement and settlements to which it is not a party were not raised in the District Court and, therefore, cannot be considered here. <u>Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty., Fla.</u>, 48 F.4th 1222, 1233 (11th Cir. 2022).

arguments.  Westfield Nat'l Ins. Co. v. Quest Pharms., Inc., 57 F.4th 558, 565-66 (6th Cir. 2023); Acuity v. Masters Pharm., Inc., 169 Ohio St. 3d 387, 395, 205 N.E.3d 460, 468 (2022); Ace Am. Ins. Co. v. Rite Aid Corp., 270 A.3d 239, 253 (Del. 2022).

While the Sixth Circuit recognized the argument "has some intuitive appeal," it concluded this provision "was meant to include derivative claims, like loss of consortium claims by family members, and subrogation claims, often brought by 'organizations' such as insurance companies that are directly related to and dependent on the existence of a particular bodily injury."  Quest, 57 F.4th at 566 (citations omitted).  The Delaware Supreme Court reached the same conclusion in Rite Aid, noting the opioid plaintiffs did not bring claims for derivative loss, "but rather a direct claim for its own aggregate economic injury."  270 A.3d at 253. Bloodworth cannot argue the plaintiffs in the Underlying Litigation have raised derivative claims, like loss of consortium or subrogation claims. If the plaintiffs in the Underlying Litigation had raised claims for derivative loss, those plaintiffs would have had to identify the particular loss upon which the derivative claim was based. There is no such allegation in the complaints in the Underlying Litigation.

A similar "care or loss of services" provision was also cited in Cesnik.  219 F.3d at 1330-31.  Even with citation to this similar provision, this Court still held, "the express terms of the policy at issue in the present case require a connection

between the damages sought and a covered bodily injury," and found no such connection was provided by allegations regarding costs of care for the plaintiffs' children.  Id. at 1332 (noting the insurer had no duty to defend against claims that sought damages for medical, psychiatric, educational, and childcare expenses).

In fact, the "care or loss of services" provision actually shows why there is no coverage under the Policies for the Underlying Litigation.  Notably, this provision uses a definite article to refer to "the 'bodily injury'" ([Doc. 32-2] at 28).  Use of "the" demonstrates "the damages sought in the underlying suit need to be tied to a particular bodily injury sustained by a person or persons in order to invoke coverage under the policies." Acuity, 205 N.E.3d at 470; see also Evanto v. Fed. Nat'l Mortg. Assn, 814 F.3d 1295, 1298 (11th Cir. 2016) (use of "definite article ('the')" connotes a "particular" object).  As such, Bloodworth's citation to the "loss of services" provision does not support its coverage position.

### ii.    Exclusion – Designated Products Endorsement

Next, Bloodworth argues the claims in the Underlying Litigation must be covered under the Policies because there was a 2013 endorsement to the Policies that added an exclusion for prescription pharmaceutical sales.  (Appellant's Brief at 27-28).  This argument fails for several reasons.  First, and most importantly, Bloodworth did not raise this argument in the District Court, and this Court does

- 31 -

"not consider arguments raised for the first time on appeal."  <u>Chabad Chayil, Inc.</u>, 48 F.4th at 1233.

Second, while Bloodworth argues this endorsement creates an ambiguity and surplusage in the Policies, it also notes there is a "dispute" as to "whether [the endorsement] was actually incorporated into the Policies."  (Appellant's Brief at 27-28 & 27 n.5).  Appellees have never raised this endorsement as a basis for denying coverage in this declaratory judgment action, and therefore, the existence of this language in the Policies would not be the subject of discovery in any phase of this proceeding.  (<u>See</u> [Doc. 1] and [Doc. 14]).  Bloodworth cannot argue this language alters the meaning of the Policies while, in the same breath, arguing the language may not appear in the Policies at all.

Finally, the issue on appeal is whether the Underlying Litigation falls within the Policies' insuring agreements.  Exclusions—like the endorsement cited by Bloodworth—do not create coverage. If the insuring agreement does not cover a claim, no resort to any exclusions is necessary or authorized. <u>Macon Iron & Paper Stock Co., Inc. v. Transcontinental Ins. Co.</u>, 93 F. Supp. 2d 1370, 1372 (M.D. Ga. 1999); <u>Allstate Ins. Co. v. Grayes</u>, 216 Ga. App. 419, 421 (1995).  This Court has recognized, "[e]xclusionary clauses . . . cannot be relied upon to create coverage through principles of contract interpretation where otherwise there is none."

Amerisure Mut. Ins. Co. v. Auchter Co., 673 F.3d 1294, 1301 (11th Cir. 2012) (applying Florida law) (quotations and citations omitted).

While Georgia courts acknowledge the anti-surplusage canon, Nat'l Cas. Co. v. Georgia Sch. Boards Ass'n-Risk Mgmt. Fund, 818 S.E.2d 250, 253 (Ga. 2018), it is not a mandatory rule.  In fact, under Georgia law, courts are not permitted to resort to such canons when there is clear policy language.  Longstreet v. Decker, 717 S.E.2d 513, 516 (Ga. Ct. App. 2011) ("[I]f the language is clear the contract shall be enforced according to its clear terms. In fact, no construction is even permitted when the language employed by the parties in the contract is plain, unambiguous, and capable of only one reasonable interpretation.").  Federal courts have recognized the anti-surplusage canon "needs to be deployed with special care given the prevalence of lengthy policies filled with iteration." Colonial Pipeline Co. v. AIG Specialty Ins. Co., No. 1:19-CV-762-MLB, 2022 WL 866414, at *2 (N.D. Ga. Mar. 23, 2022) (citing Santo's Italian Cafe LLC v. Acuity Ins. Co., 15 F.4th 398, 405–06 (6th Cir. 2021)) (quotations omitted).

Bloodworth did not raise any argument regarding the designated products endorsement below, so the District Court had no opportunity to consider it.  What is more, Bloodworth disputes whether this endorsement was properly included in the Policies, and the record is devoid of evidence regarding the endorsement.  As such, there is no undisputed evidence to support Bloodworth's argument.  Even if

- 33 -

Bloodworth had raised this argument in the District Court, and the record demonstrated this endorsement was included in the Policies, the anti-surplusage canon would have had no applicability in light of the Court's determination that the policy language at issue is unambiguous. Accordingly, this argument is both improper and unpersuasive.

### iii. Bloodworth fails to address policy provisions which support the Appellees'—and the District Court's—interpretation of the policy language.

To the extent that additional policy language is relevant to determining whether the economic-loss claims in the Underlying Litigation seek "damages because of 'bodily injury,'" Bloodworth fails to point to several policy provisions which demonstrate this phrase refers to a particular physical injury.

First, the Policies require Bloodworth to advise Appellees as soon as practicable of "[h]ow, when and where the 'occurrence' or offense took place"; "[t]he names and addresses of any injured persons and witnesses"; and "[t]he nature and location of any injury or damage arising out of the 'occurrence' or offense." ([Doc. 32-2] at 38). This provision also shows coverage is limited to claims that are based on specifically identifiable bodily injuries. Bloodworth did not, and could not, comply with this condition in the Underlying Litigation because the plaintiffs have never alleged, and need not prove, any specific individual was injured. Because no

individuals are identified, Bloodworth cannot know, and cannot tell, its insurers who was injured, who witnessed the injury, or when and where it occurred.

Additionally, the CGL Policies provide that a loss is considered known when the insured "[r]eports all, or any part, of the 'bodily injury'" or "receives a written or verbal demand or claim for damages because of the 'bodily injury.'"(Id. at 28) (emphasis added).  Such provisions further underscore that "the damages sought in the underlying suit need to be tied to a particular bodily injury sustained by a person or persons in order to invoke coverage under the policies." Acuity, 205 N.E.3d at 470. Any other reading would make it "difficult to determine whether the bodily injury occurred during the policy period, was caused by an occurrence in the coverage territory, or had occurred in whole or in part prior to the policy period." Acuity, 205 N.E.3d at 470-71; see also Quest, 57 F.4th at 565 (holding similar provisions "indicate that the policies extend coverage only to claims seeking compensation related to specific, identifiable injuries."). Similarly, the Policies cover only "bodily injury, sickness or disease sustained by a person," ([Doc. 32-2] at 40), thereby "emphasizing that the lawsuits must be tied to an individual's (or individuals') bodily injury or injuries."  Quest, 57 F.4th at 564.

These provisions show the Policies require claims for damages because of a particular bodily injury.  The Underlying Litigation makes no such claims.  The Underlying Litigation concerns purely economic losses which are not tied to a

particular injury.   As the appellate courts in <u>Rite Aid</u>, <u>Acuity</u>, and <u>Quest</u> have concluded, the language in the Policies themselves dictate a finding of no coverage for the Underlying Lawsuits.

> **b. Bloodworth cannot rely on settlements to which neither it nor Appellees are a party.**

In addition to its citations to the "loss of services" provision and designated products endorsement, Bloodworth looks to settlements in the MDL to argue damages are sought "because of 'bodily injury'" within the meaning of the Policies. (Appellant's Brief at 29-40).   Like its argument regarding the endorsement, this argument was not raised below and cannot be considered on appeal.   <u>Chabad Chayil, Inc.</u>, 48 F.4th at 1233.   This rule is especially important with respect to this argument, as it is based on settlements and statutory allocations of settlement funds that are not in the record of this case.

The statute cited by Bloodworth concerns how the General Assembly plans to allocate settlement funds in opioid litigation settlements.    (Appellant's Brief at 30-31 (citing O.C.G.A. § 10-13B-1)).   It is unknown whether any of the plaintiffs in the Underlying Litigation will opt out of future settlements to which the statute might apply.   It is also unclear whether any of the parties involved in the settlements made thus far were in the same class of defendants as Bloodworth, whether the claims they settled were the same types of claims raised against Bloodworth, whether they sought the same type of relief, or whether the claims were supported by similar

factual allegations. The legislative history of this statute and the settlements reached under the statute were not before the District Court and, as a result, are not in the record before this Court. Thus, it is impossible to discern whether these settlements and the statute regarding the settlements would have any relationship to this case whatsoever.

Even if such settlements had been raised below and were in any way related to this case, they do not change the coverage analysis. Courts look skeptically on settlements negotiated by policyholders without the insurer's input as a basis for coverage because both policyholders and tort plaintiffs have an incentive to insert language to make the claim appear covered. Windt, § 6:31, Determining whether grounds for settlement were outside policy coverage, 2 Insurance Claims and Disputes § 6:31 (6th ed.) ("The insurer should not, however, be bound by how the settlement is allocated by the insured/claimant or by what the agreement states is the reason the settlement money was paid."). There is no evidence the plaintiffs in the Underlying Litigation have entered into any settlements, and, therefore, any allocation of funds in any settlements reached thus far have no application in this case. However, even if the plaintiffs in the Underlying Litigation opted into settlements where some portion of the funds are allocated for medical care in the future, such allocation would not demonstrate that coverage is owed under the Policies. In Cesnik, this Court found allegations that the plaintiffs suffered increased

care costs for their children due to injury was insufficient to confer coverage.  219 F.3d at 1332.  Similarly here, the fact that some of the societal costs incurred by the plaintiffs in the Underlying Litigation are related to medical care is too tenuous a connection.  Finally, Appellees' duty to defend is based on the allegations in the Underlying Litigation complaints, and not the post hoc allocation of settlement funds. See Auto-Owners Ins. Co. v. State Farm Fire & Cas. Co., 297 Ga. App. 751, 754 (2009) (holding "[a]n insurer's duty to defend is determined by comparing the allegations of the complaint with the provisions of the policy.") (citation omitted).

Because this argument comes too late and, in any event, does not override the language of the Policies and the pleadings to which Bloodworth is actually a party, this argument does not warrant reversal of the District Court's coverage determination.

### 4. Bloodworth presents the minority view of the coverage analysis without meaningfully addressing the growing trend of courts finding no coverage in this context.

Finally, Bloodworth contends this Court should follow the decisions in Cincinnati Ins. Co. v. H.D. Smith, LLC, 829 F.3d 771 (7th Cir. 2016), AIU Insurance Co. v. McKesson Corp., 598 F. Supp. 3d 774 (N.D. Cal. 2022), Giant Eagle, Inc. v. Am. Guar. & Liab. Ins. Co., 499 F. Supp. 3d 147 (W.D. Pa. 2020), Walmart, Inc. v. ACE American Ins. Co., et al., Case No. 04CV22-2835-4 (Ark. Cir. Ct. December 29, 2023), and AmerisourceBergen Drug Corp. v. ACE Am. Ins. Co., 2020 W. Va.

Cir. LEXIS 3 (Nov. 23, 2020).  (Appellant's Brief at 31-34).  However, these cases were wrongly decided and are contrary to an overwhelming majority of recent decisions analyzing insurance coverage for similar opioid cases under similar policies.

The only appellate decision upon which Bloodworth attempts rely to support its position (as it is the only appellate decision in favor of its argument) is H.D. Smith, which was based on a faulty premise that has since been rejected by multiple appellate courts considering identical issues.  In H.D. Smith, the Seventh Circuit analogized government opioid suits to claims by a mother seeking to recover costs she incurred while caring for her sick child.  829 F.3d at 774.  The Rite Aid, Acuity, and Quest Courts all noted the flaws in this analogy, as those appellate courts recognized the hypothetical mother "still would have to prove the existence of her child's injuries to recover her caregiving costs, while the underlying plaintiffs here do not."  Quest, 57 F.4th at 564. "Unlike the hypothetical mother, the governments in the underlying suits do not tie their alleged economic losses to particular bodily injuries sustained by their citizens but to the aggregate economic injuries they have experienced because of the opioid epidemic."  Acuity, 205 N.E.3d at 473.

The H.D. Smith analogy only illustrates the proper application of the "loss of services" provision to derivative claims for economic losses, like the mother's medical-expense payments, see 57B Am. Jur. 2d Negligence § 954 (2023 ed.)

(suits "for medical expenses paid on behalf of an injured spouse or child are derivative") (footnotes omitted)), while confirming the provision does not apply to claims for economic losses not measured by specific injuries.

The analogy also falls apart under Georgia law. The Cesnik Court found allegations regarding care for a child's injury were insufficient to confer coverage where the claims actually raised by the plaintiffs were not personal injury claims. 219 F.3d at 1332. Similarly in the Underlying Litigation, there are no personal injury claims raised by the plaintiffs, as such claims were strategically omitted to avoid time constraints and issues of proof.

Moreover, the analysis in H.D. Smith relies on a perceived difference under Illinois law between a policy covering damages "because of bodily injury" and one providing coverage for damages "for bodily injury." 829 F.3d at 774. Here, however, the Policies use those terms interchangeably. ([Doc. 32-2] at 45). Thus, "even if the terms are not equivalent, this mixed usage informs an insured's expectations by hinting that those terms are at least comparable." Quest, 57 F.4th at 565. In any event, to the extent Bloodworth argues "because of bodily injury" is broader than "for bodily injury," the Eleventh Circuit interpreted "because of bodily injury" to require more than "the mere fact that bodily injury occurred" in order to trigger coverage. Cesnik, 219 F.3d at 1331. The mere fact that bodily injury occurred is all that is present in the Underlying Litigation.

- 40 -

H.D. Smith is further flawed in its analysis of Illinois law, as the Seventh Circuit disregarded several key cases by Illinois courts. For example, the Seventh Circuit disregarded Illinois law that economic losses sustained by the government because of lost productivity due to employee illness were not damages "on account of" bodily injury." Diamond State Ins. Co. v. Chester-Jensen Co., Inc., 243 Ill. App.3d 471, 478, 611 N.E.2d 1083 (1993).  It also disregarded Illinois law that damages sought by a governmental entity for costs of emergency medical services, law enforcement, and criminal prosecutions due to gun violence were barred by the economic loss doctrine because there were no damages because of bodily injury. City of Chicago v. Beretta U.S.A., Corp., 213 Ill. 2d 351, 821 N.E.2d 1099 (2005). Indeed, it is telling that H.D. Smith was the first appellate opinion to examine these coverage issues, and its reasoning has been rejected by every appellate court to consider the issues since then.  See Acuity, 205 N.E.3d at 466; Quest, 57 F.4th 558; Rite Aid, 270 A.3d at 253.[7]

With respect to AIU Ins. Co. v. McKesson Corp., 598 F. Supp. 3d 774 (N.D. Cal. 2022), this district court decision was appealed to the Ninth Circuit, and the

---

[7] Trial courts have also rejected the reasoning in H.D. Smith. See, e.g., IN RE: CVS OPIOID INSURANCE LITIGATION, No. N22C-02-045 PRW CCLD, 2024 WL 3882607, at *4 n.38 (Del. Super. Ct. Aug. 20, 2024); Westfield Nat'l Ins. Co. v. Quest Pharms., Inc., No. 5:19-CV-00083-TBR, 2021 WL 1821702, at *3 (W.D. Ky. May 6, 2021); Motorists Mut. Ins. Co. v. Quest Pharms., Inc., No. 5:19-CV-00187-TBR, 2021 WL 1794754, at *3 (W.D. Ky. May 5, 2021).

Ninth Circuit did not reach the issue now before this Court. <u>AIU Ins. Co. v.</u> <u>McKesson Corp.</u>, No. 22-16158, 2024 WL 302182, at *4 (9th Cir. Jan. 26, 2024). In the district court decision cited by Bloodworth, the Northern District of California concluded there was no coverage under the CGL policies because the opioid lawsuits did not allege deliberate conduct or an additional, unexpected, independent, and unforeseen happening to trigger the insurers' duty to defend. 598 F. Supp. 3d at 788-99. That determination of no coverage was affirmed on appeal, and, accordingly, the Ninth Circuit did not address whether the opioid lawsuits sought "damages because of 'bodily injury.'" <u>McKesson</u>, 2024 WL 302182 at *4. Albeit under a different policy provision, the Ninth Circuit thus joined the majority of appellate courts to review opioid litigation claims and determine there is no coverage for the economic-loss lawsuits under the standard CGL coverage form.

However, it is worth noting the <u>McKesson</u> district court's analysis of the phrase "damages because of 'bodily injury'" should not be followed here, as it relied on the flawed decision in <u>H.D. Smith</u> to conclude government opioid lawsuits "potentially meet the 'bodily injury' requirement for coverage." 598 F. Supp. 3d at 787-88. Further, the Northern District of California focused on the "care or loss of services" provision to reject a perceived strawman argument by the insurers that coverage was not available if the plaintiffs could not themselves suffer bodily injury. <u>See</u> <u>id</u>. at 785-86 (referring to "[i]nsurers' argument that the government plaintiffs

themselves suffered no bodily injury"). Appellees have not made that argument in this case. Finally, to the extent <u>McKesson</u> interpreted "because of 'bodily injury'" to confer coverage where there is <u>any</u> connection to bodily injury, this interpretation does not comport with Georgia law as interpreted by this Court. <u>Cesnik</u>, 219 F.3d at 1332.

Bloodworth also cites <u>AmerisourceBergen Drug Corp</u> and <u>Giant Eagle</u>. However, both of these decisions relied heavily on <u>H.D. Smith</u> and the now-overturned Delaware Superior Court decision in <u>Rite Aid</u>. Moreover, the <u>Giant Eagle</u> court ultimately vacated its decision on other grounds. <u>See</u> <u>Giant Eagle, Inc. v. Am. Guar. & Liab. Ins. Co.</u>, 2021 WL 6276267, at *25 (W.D. Pa. May 25, 2021). <u>Walmart</u>, Case No. 04CV22-2835-4, is similarly flawed in its heavy reliance on <u>H.D. Smith</u>. It is currently on appeal in the Arkansas Court of Appeals, Case No. CV-24-417.

In sum, the only appellate decision upon which Bloodworth attempts to rely is based on a flawed analogy and ignores significant principles of the state law it purports to apply. Every subsequent appellate court has had the benefit of reviewing the <u>H.D. Smith</u> analysis, and after doing so, all of those courts have reached the opposite conclusion. The remaining trial court decisions cited by Bloodworth are on appeal, have been overturned, or rely on <u>H.D. Smith</u> and overturned caselaw.

Accordingly, the persuasive authority cited by Bloodworth should not be followed here.

Bloodworth only pays lip service to the actual trend of persuasive authority, which favors Appellees' position, by noting "there is a split among circuits" as to the issue in this appeal. (Appellant's Brief at 35). It does not cite the cases supporting Appellees' position, much less argue why they should not be followed here. To the extent Bloodworth attempts to distinguish those cases or criticize their reasoning in its reply brief, such arguments will have come too late. Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 680–83 (11th Cir. 2014).

Indeed, Bloodworth cannot deny the District Court's coverage analysis under Georgia law is consistent with the majority of persuasive authority to examine a materially identical question. Since January 2022, three appellate courts—the Sixth Circuit and the Supreme Courts of Delaware and Ohio—have held liability policies with nearly identical language as the Policies at issue do not provide coverage in similar opioid suits. Quest, 57 F.4th at 562-67; Acuity, 205 N.E.3d at 469-73; Rite Aid, 270 A.3d at 246-54. As those decisions explain, liability coverage for "damages because of 'bodily injury'" does not apply to pure economic-loss claims, even if they bear some connection to bodily injuries. Rather, liability coverage exists only where the underlying plaintiff either suffers bodily injuries herself, sues on behalf of the injured person, or asserts damages measured by the cost to treat specific bodily

injuries or care for specific injured people. See Rite Aid, 270 A.3d at 249 (covered claim "must seek to recover for the personal injury or seek damages derivative of the personal injury"); Quest, 57 F.4th at 567 ("The plain language instead indicates that claims must in some way derive from a particular bodily injury to a person."). Applying these rules, these decisions repeatedly rejected coverage for government opioid suits because the underlying plaintiffs sought to recover damages only "for their own aggregate economic injuries caused by the opioid epidemic and not for any particular opioid-related bodily injury sustained by a citizen." Acuity, 205 N.E.3d at 468; see also Travelers Prop. Cas. Co. of Am. v. Anda, Inc., 90 F. Supp. 3d 1308, 1314 (S.D. Fla. 2015) (rejecting coverage for government opioid suit).

The Rite Aid, Acuity, and Quest courts construed the phrase "because of 'bodily injury'" to require a direct causal connection. They held, "[t]he complaint must do more than relate to a personal injury--it must seek to recover for the personal injury or seek damages derivative of the personal injury." Rite Aid, 270 A.3d at 249. These courts concluded, "the phrase 'damages because of bodily injury' . . . requires more than a tenuous connection between the alleged bodily injury sustained by a person and the damages sought." Acuity, 205 N.E.3d at 470-71. Rather, "the damages sought in the underlying suit need to be tied to a particular bodily injury sustained by a person or persons in order to invoke coverage under the policies." Id.; accord Quest, 57 F.4th at 567 ("The plain language [of the policies] . . . indicates

that claims must in some way derive from a particular bodily injury to a person."). These courts distinguished the claims raised in the government opioid litigation from claims seeking "damages because of 'bodily injury'" because the opioid plaintiff "need not plead and prove the existence of a covered bodily injury to recover against [a pharmaceutical distributor]." Quest, 57 F. 4th at 563.

Rite Aid, Acuity and Quest are in accord with Anda, 90 F. Supp. 3d 1308, aff'd on other grounds 658 F. App'x 955 (11th Cir. 2016), the only other district court decision in the Eleventh Circuit to directly address whether opioid lawsuits raise claims for "damages because of 'bodily injury'".    In Anda, the Southern District of Florida rejected coverage for a lawsuit similar to the Underlying Litigation, explaining that the state government which brought the underlying suit "d[id] not purport to assert claims on behalf of individual citizens for the physical harm sustained personally by those citizens." 90 F. Supp. 3d at 1314. "Instead, [the governmental plaintiff] s[ought] relief from the massive costs suffered by the State due to Anda's distribution of drugs allegedly in excess of legitimate medical need." Id. Thus, the underlying governmental plaintiff did not "assert claims 'for bodily injury' or 'because of bodily injury,' because the claims [were] 'for' and 'because of' economic harm to the State." Id. at 1318.

Anda relied on Cincinnati Ins. Co. v. Richie Enterprises LLC, Case No. 1:12-CV-00816, 2014 WL 3513211 (W.D. Ky. 2014), in which a Kentucky

federal district court likewise concluded the West Virginia opioid litigation did not allege "damages because of 'bodily injury'." The <u>Richie</u> court found that, "in the absence of [a] medical monitoring claim, [the plaintiff] is solely seeking damages for the money it has been required to spend because of the prescription drug use epidemic . . . ." <u>Id</u>. at *5. The court noted references to citizens' physical harm and death due to opioid use "only explains and supports the claims of the actual harm complained of: the economic loss to the State . . . ." <u>Id</u>. It went on to distinguish between damages "because of" West Virginians bodily injury—which were not raised by the State—and damages West Virginia "has been required to incur costs due to [the underlying defendants'] alleged distribution of drugs in excess of legitimate medical need." <u>Id</u>. at *6. The <u>Richie</u> court called this distinction "slight" but "important." <u>Id</u>. This analysis is consistent with <u>Cesnik</u>, which held there was no coverage, despite allegations that the adoptive-parent plaintiffs incurred costs for their adoptive children's care for bodily injuries, because the plaintiffs did not raise any claims on account of those bodily injuries. 219 F.3d at 1331.

Thus far, six appellate courts have been asked whether CGL policies provide insurance coverage for economic-loss claims in the nationwide opioid litigation. Five of those courts have answered that question in the negative. <u>See</u> <u>McKesson</u>, 2024 WL 302182, at *4; <u>Westfield.</u>, 57 F.4th at 562-67; <u>Acuity</u>, 205 N.E.3d at 469-73; <u>Rite Aid</u>, 270 A.3d at 246-54; <u>Anda</u>, 658 F.App'x 955. Bloodworth cannot

rely upon the outlier decision in <u>H.D. Smith</u> and wholly ignore the clear weight of persuasive authority to the contrary.

The District Court's Order is therefore consistent with both Georgia law and the trend of decisions nationwide, and that ruling should be affirmed.

**B.    Bloodworth's "Occurrence" Issue Concerns Unappealable <u>Dicta</u> and Advances Arguments Not Raised Below.**

**1.    Bloodworth's "occurrence" issue concerns statements made in <u>dicta</u>.**

In the second issue raised on appeal, Bloodworth asserts the District Court ruled the Underlying Litigation did not allege an "occurrence" within the meaning of the Policies.  (Appellant's Brief at 36-40).  However, a closer review of the District Court's Order demonstrates the Court's brief discussion of "occurrence" was only <u>dicta</u> included as part of its reasoning regarding the meaning of the phrase "damages because of 'bodily injury'" in the opioid litigation context.  The District Court's Order specifically stated the Court analyzed how the definition of "occurrence" impacted its interpretation of the phrase "because of 'bodily injury'" in the Policies, as that section of the Order is entitled, "Viewing the Policies' 'Because of Bodily Injury' <u>Together with 'Occurrence'</u>".  ([Doc. 45] at 13) (emphasis added). The Court "assess[ed] the provision 'because of 'bodily injury'' in light of the term occurrence," and did not make an independent determination regarding that issue.  (<u>Id</u>. at 16).  The District Court's actual ruling was as follows:

Accordingly, the Court finds that there is no genuine dispute of material fact as to whether the provision <u>"because of 'bodily injury'"</u> provides coverage for nonphysical damages, such as economic losses, sought by healthcare providers and governmental entities for having provided various treatments, services, and programs to combat and abate the opioid epidemic in the underlying opioid lawsuits. To be clear, the Court, by this Order, finds only that economic damages, that are not connected to a specific individual who suffered physical bodily injury, are not covered by the Policies at issue in the above-styled matter. Therefore, Plaintiffs Allied and AMCO's Motion for Summary Judgment (Doc. 32) is GRANTED and Defendant Bloodworth's Motion for Summary Judgment (Doc. 31) is DENIED.

(<u>Id</u>. at 17) (emphasis added).

Because the District Court did not make a ruling regarding "occurrence," its extraneous statements regarding how that term affected the meaning of "damages because of 'bodily injury'" need not be reviewed. Appeals to this Court are from a district court's final judgment, and not its opinion. <u>Walter Int'l Prods., Inc. v. Salinas</u>, 650 F.3d 1402, 1420 n.13 (11th Cir. 2011) (citing <u>United States v. $242,484.00</u>, 389 F.3d 1149, 1153 (11th Cir. 2004) (en banc) (holding an "appeal is not from the opinion of the district court, but from its judgment")); <u>see also</u> <u>Church of Scientology of Cal. v. United States</u>, 506 U.S. 9, 12 (1992) (holding "a federal court has no authority to give opinions upon . . . abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue" (citation and internal quotation marks omitted)).

As such, Bloodworth's due process argument on appeal regarding "occurrence" should be disregarded altogether.

- 49 -

**2.    This Court should disregard Bloodworth's substantive argument as to whether the complaints in the Underlying Litigation allege an "occurrence" because those arguments were not raised or considered in the District Court.**

Bloodworth's substantive arguments about the meaning of the term "occurrence" in the Policies within the context of the Underlying Litigation also should be disregarded.  As Bloodworth acknowledges, the parties did not brief this issue in the District Court.  (Appellant's Brief at 39-40).  Likewise, the District Court's Order did not examine the meaning of "occurrence" as an independent basis for denying coverage under the Policies.  (See [Doc. 45] at 13-17).  Accordingly, Bloodworth's entire argument sent forth in Section II(B) of its brief is entirely based on new arguments not advanced in its Motion for Summary Judgment and should not be considered by this Court.

It is well-settled that "an issue not raised in the district court and raised for the first time in an appeal will not be considered by this Court."  Access Now, Inc. v. Southwest Airlines, Co., 385 F.3d 1324, 1331 (11th Cir. 2004). This Court has explained, "as a court of appeals, we review claims of judicial error in the trial courts," and reviewing claims "that district courts never had a chance to examine [. . .] would not only waste our resources, but also deviate from the essential nature, purpose, and competence of an appellate court." Id.  This Court should not decide in the first instance whether the allegations in the Underlying Litigation allege an "occurrence" within the meaning of the Policies.

- 50 -

## CONCLUSION

There is no coverage available to Bloodworth under any of the CGL Policies or the Umbrella Policies because the plaintiffs in the Underlying Litigation do not seek "damages because of 'bodily injury'" from Bloodworth. Under Georgia law, and consistent with the majority of persuasive authority, this phrase requires more than a tenuous connection to a particular physical injury. Here, the Underlying Litigation is not tied to any particular physical injury, and the claims for economic loss of governmental entities and healthcare providers is only tangentially related to physical harm. The District Court correctly applied Georgia law in reaching this conclusion, and its coverage analysis is further supported by the majority of persuasive authority and additional terms of the Policies. Accordingly, the District Court's Order should be affirmed. Because the District Court did not rule whether the Underlying Litigation allege an "occurrence" under the Policies, Bloodworth's arguments as to that issue must be disregarded.

WHEREFORE, Appellees respectfully request this Court affirm the District Court's order finding they do not owe a duty to defend or indemnify Bloodworth in the Underlying Litigation.

*[signature on following page]*

- 51 -

This 4th day of September, 2024.

Respectfully submitted,

By:    */s/ Lee Clayton*
Lee Clayton
Georgia State Bar No. 601004
Lauren D. Woodrick
Georgia State Bar No. 324394
*Counsel for Appellees*

**SWIFT, CURRIE, MCGHEE & HIERS, LLP**
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309
Tel:   (404) 874-8800
Fax:   (404) 888-6199
Lee.Clayton@swiftcurrie.com
Lauren.Woodrick@swiftcurrie.com

**<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Fed. R. App. P. 32(g), I certify that the foregoing document complies with the volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,018 words, as created by Microsoft Word, excluding the items that may be excluded under Fed. R. App. P. 32(f). I further certify this Brief was filed in electronic format through the Court's CM/ECF system on this 4th day of September, 2024.

**SWIFT, CURRIE, McGHEE & HIERS, LLP**

By:    _/s/ Lee Clayton_____
         Lee Clayton

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 25 of the Federal Rule of Appellate Procedure, I hereby certify I have this 4th day of September, 2024 served a copy of the foregoing document electronically through the Court's CM/ECF system on all registered counsel.

**SWIFT, CURRIE, McGHEE & HIERS, LLP**

By:    */s/ Lee Clayton*
          Lee Clayton